S. F. CASENBURG *v.* B. I. LEWIS, ADMR.*

(*Knoxville,* September Term, 1930.)

Opinion filed July 20, 1931.

---

*As to liability of physician for erroneous exercise of judgment, see 21 R. C. L., 391; R. C. L., Perm. Sup., p. 5051; R. C. L., Pocket Part, title "Physicians and Surgeons," section 35.

LEE, PRICE, McDERMOTT & MEEK, for plaintiff in error.

KRAMER & KRAMER, for defendant in error.

MR. JUSTICE COOK delivered the opinion of the Court.

The parties are referred to as in the trial court. This action is grounded upon the complaint that plaintiff's intestate, Mrs. Lucy Lewis, was negligently injured by a third degree burn through treatment administered by the defendant May 5, 1924. At a former trial the circuit judge directed a verdict for the defendant. In *Lewis* v. *Casenburg*, 157 Tenn., 187, this court concurred with the Court of Appeals in holding that, under the doctrine of *res ipsa loquitur*, there was sufficient evidence to carry the case to the jury, and the cause was remanded for another trial.

A second trial resulted in a verdict and judgment for the plaintiff. Upon review the Court of Appeals held that the motion for peremptory instructions should have been sustained in the trial court, and for that error reversed the trial judge. The cause is here for review upon *certiorari* to the Court of Appeals.

The material facts presented by the record are that early in 1918, Dr. Boies, assisted by Dr. McCreary, operated on Mrs. Lewis for abdominal tumor. After the incision they found it inadvisable to remove the growth.

Dr. Boies says because it was malignant. Dr. McCreary says because of adhesions to vital organs. The opening was closed and when it healed Mrs. Lewis was sent to. Dr. Casenburg for X-ray treatment. By this treatment the growth was reduced and use of the X-ray was discontinued until 1920. Its use was again resumed and the growth subsided but treatments continued intermittently until May, 1924. From the first treatment in 1918 to sometime prior to May 5, 1924, Dr. Casenburg gave Mrs. Lewis one hundred and sixty X-ray treatments.

Dr. Casenburg and Miss Burnett, his technician, testified that dosage of the same quantity, quality and intensity was applied each time to the back and the abdomen. No injury developed from any of the one hundred and sixty treatments. May 5, 1924, the X-ray was again applied in equal dosage to the abdomen and back, and resulted in a third degree burn of the abdomen. The burnt space was about seven inches in diameter, or as described by some of the witnesses it covered a space seven by nine inches, and extended in depth to the underlying abdominal membrane. According to the testimony, the tissues were destroyed throughout to the abdominal membrane.

Mrs. Lewis commenced the action but died January 14, 1926. Dr. Lott gives as the immediate cause of her death appendicitis, superinduced by the X-ray burn that made it impossible to relieve her by an operation, because the opening would have extended through the burnt tissue without possibility of healing.

As stated in the former opinion, the doctrine of *res ipsa loquitur* is applicable if the instrument that produced the injury was under exclusive control of the defendant and injury would not ordinarily result if due care was exercised. Applying the rule, it is said the fact

of injury makes out a *prima-facie* case of negligence and in the absence of countervailing explanatory proof to overcome the *prima-facie* case liability would follow. It is said that the inference of negligence arises under the doctrine of *res ipsa loquitur* and the *prima-facie* case thereby established becomes conclusive unless rebutted by opposing evidence. When rebutted by opposing evidence the weight of the inference as well as the weight of the explanation is for the determination of the jury, unless uncontradicted explanatory evidence excludes the inference that injury resulted from want of ordinary care.

At the first trial, as indicated by the published opinion, the defendant emphasized individual idiosyncrasy or the supersensitiveness of Mrs. Lewis to influence of the X-ray as the primary cause of her injury. At this trial idiosyncrasy, superinduced by the cumulative effect of past treatments, was presented as a theory of the defense with the explanation that the cumulative effect of the treatments resulting in the third degree burn could not have been foreseen.

Another explanation or theory of the defense was that the negligent use of scarlet red on the itching surface of the abdomen converted a first degree burn into a third degree burn.

Dr. Hedge, whose testimony is referred to in the published opinion, testified on the second trial as in the first, that third degree burns are unusual, and in this trial testified that they result from one of the following causes:

First. An excessive dosage, caused by failure of the X-ray operator to use proper filterage, or result from excessive exposure, or increased intensity of the ray.

Second. Idiosyncrasy, that is a peculiar susceptibility of the patient to influence of the X-ray.

Third. Failure of the operator to observe the patient so as to determine whether the cumulative effects of preceding treatments have approached the danger point.

Dr. Casenburg and other witnesses testified that the X-ray apparatus used in the treatment was that in common use by other physicians, that it was properly used and the ray applied properly in respect to both time and intensity, both on the occasion of May 5, 1924, and all preceding occasions, and Dr. Casenburg testified that the injurious effect of the last treatment of Mrs. Lewis by X-ray was unavoidable.

The Court of Appeals concluded that defendant was confronted with the necessity of determining whether he should let the patient die of the malignant growth for which he had been treating her or continue the treatment to arrest the growth, and for the exercise of his judgment in continuing the treatment after one hundred and sixty antecedent treatments he would not be liable for the consequences.

It is the physician's privilege to decide between one of two or more courses in the treatment of his patients and, as said by the Court of Appeals, he could not be held responsible for an erroneous exercise of judgment. That rule is subject, however, to the limitation that before exercising judgment the physician should inform himself by proper examination so as to ascertain the facts and circumstances on which a reasonable exercise of judgment might rest.

The defendant knew that he had given one hundred and sixty treatments by X-ray. The cumulative effect of those treatments were known or should have been known to him as an X-ray expert, as well as the means of ascertaining when an additional treatment would be hazardous to the patient.

All the physicians agree in their testimony that the cumulative effect of X-ray is ordinarily disclosed by dryness and pigmentation of the skin so as to enable the X-ray specialist to discover the danger of an additional treatment by superficial or surface symptoms. They also agree that the cumulative effects of the X-ray are not always visible in endarteritis. Endarteritis is a term signifying the thickening of the small arteries and veins and producing inflammation that reveals itself on the surface of the skin, or it may sometimes change these small blood vessels from cellular to fiberous content and produce the danger of a third degree burn without disclosing the superficial symptoms.

An examination and comparison of the testimony of Dr. Hedge discloses no substantial difference in his testimony relating to the same facts, as given at this trial and at the former trial. It is more a change in mode of expression than substance, together with additional testimony touching new or subsequently emphasized theories presented by the defense. One of these new or subsequently emphasized theories was that the burn resulted from the cumulative effects of the X-ray producing endarteritis. This very naturally called for additional testimony explanatory of new facts involved.

Dr. Hedge testified that when endarteritis, or the blood change indicative of it, is not visible on the surface that the condition may be determined by blood count examination. He further testified that without cumulative effects visible or ascertainable on reasonable examination, the X-ray dosage or formula, if properly followed, could not produce a third degree burn.

When the last treatment was given by defendant he says that he examined the skin, both on the back and abdomen, and that there was no pigmentation or dryness.

Dr. Abercrombie testified that endarteritis would not be apparent to the operator through examination of the skin and so does Dr. McCampbell. They refer to no other mode of ascertaining the existence of this dangerous condition. They agree with Dr. Hedge that ordinarily a third degree X-ray burn is the result of excessive dosage. This testimony discloses that superficial symptoms cannot always be relied upon to reveal the danger, that all the experts agree may result from cumulative treatment. And, therefore, the necessity for resort to additional methods of diagnosis, as blood test count referred to by Dr. Hedge.

The evidence shows that numerous treatments by X-ray carry their own warning, for all the experts testify that such treatments will lead to endarteritis. This fact known, they would lead the practitioner to reasonably conclude that the danger existed after so many repeated X-ray treatments. We think this conclusion may be reasonably inferred from the testimony of Dr. Casenburg.

Dr. Casenburg admits that he made no other examination than of the surface, that is, he only looked to the skin for pigmentation or dryness as the means of leading to his conclusion. His failure to resort to a blood test count to determine whether the danger existed would not be mere error of judgment, but the omission to do what reasonable prudence would suggest, especially where the consequence of previous treatments might lead the X-ray practitioner to reasonably apprehend the danger of an additional treatment inflicting a third degree burn.

In determining whether he should continue the treatment with likelihood of serious injury or death, the practitioner would certainly owe the duty of resorting to reasonable means of information and diagnosis, and the omission would be negligence. 48 C. J., 1128,

The conclusion is that this fact, together with others, left the explanation of defendant open to doubt and made a question for determination of the jury. Among the unexplained or controverted issues was the circumstance derived from defendant's testimony that upon each of the one hundred and sixty preceding treatments the same dosage and intensity was applied to the back and abdomen, and that on the one hundred and sixty-first treatment the same dosage was applied to both back and abdomen without injurious effect on the back. After one hundred and sixty X-ray treatments without injurious effect the theory of idiosyncrasy would be incredible. It would have revealed itself earlier if existent.

In this trial the additional theory that a first degree burn was converted into a third degree burn by use of scarlet red was introduced. About this we have a controversy. There is evidence that scarlet red was used on Mrs. Lewis' abdomen at some time after the last X-ray treatment. The physicians agree that its use within a short time after the treatment would convert a first degree into a third degree burn. But they say after two weeks the use of scarlet red would be harmless and might be beneficial. There is no evidence of when, or by whom the scarlet red was applied. Thirteen days after the treatment, on May 5th, Dr. Lott examined the burn on Mrs. Lewis and no scarlet red had been applied at that time. Dr. Lott was called again twenty-six days after the last treatment and observed that scarlet red had been applied. In the meantime Dr. Boies had treated Mrs. Lewis. He was called in nineteen days after the last X-ray treatment. He was introduced as a witness by the defendant but was not examined about the scarlet red. Dr. Lott and Dr. McCreary were the only other physicians who attended Mrs. Lewis and both deny the use of scarlet red in their treatment. If applied, it must have

been done after the danger of its use had passed. At least there is no evidence to show that it was applied prior to the thirteenth day after the last X-ray treatment —the day that Dr. Lott first examined Mrs. Lewis.

Evidence of the use of the scarlet red and its effect was not present at the first trial, and Mrs. Lewis, whose testimony was introduced at that trial, was not asked about it. She died before the second trial and, as stated, Dr. Boies, who attended her between the thirteenth and twenty-sixth day after the last treatment, though called as a witness by defendant, gave no explanation. So the time when the scarlet red was applied, whether or not it was before or after the expiration of two weeks, is left open to controversy.

Taking the explanatory evidence altogether, it does not destroy the weight of the inference arising from the doctrine *res ipsa loquitur* and so the weight of evidence, as well as the weight of the explanation, was matter for determination of the jury.

Examination of the evidence indicates that Mrs. Lewis was an invalid without determinable expectancy and without earning capacity. Medical bills covering the period from the time of the third degree burn to her death are proven and amount to a considerable sum, something near $3000. The only other tangible element upon which to base damages was the pain and suffering, an element not easily measured.

While constrained to hold with the circuit judge that there was material evidence to carry the case to the jury and that the case was properly submitted to the jury, we are not inclined to affirm the judgment without a reduction of the damages. A *remittitur* of $2000 is suggested. If accepted by plaintiff, the judgment of the circuit court will be affirmed. Otherwise reversed, because verdict was excessive, and remanded for another trial.