# BLANKENSHIP v. BAPTIST MEMORIAL HOSPITAL.—168 S. W. (2d), 491.

Western Section.   June 12, 1942.

Petition for Certiorari denied by Supreme Court, December 19, 1942.

Lowell W. Taylor, W. E. Quick, Emmett W. Braden, and Tom Robinson, all of Memphis, for plaintiff in error.

John W. McCall and Graham Moore, both of Memphis, for Baptist Memorial Hospital.

KETCHUM, J. Mrs. Blankenship sued the Baptist Memorial Hospital and Dr. J. E. Whiteleather for damages for personal injuries resulting from third degree X-ray burns alleged to have been negligently inflicted

upon her by the defendants in the treatment of cancer of the cervix.

At the close of all the proof motions were made by both defendants for peremptory instructions in their favor. The court sustained the motion of the hospital and overruled that of Dr. Whiteleather; whereupon the plaintiff took a voluntary non-suit as to Dr. Whiteleather, and filed its motion for a new trial as to the Hospital, and this motion having been denied, she has appealed in error to this court. The only error assigned here is based on the action of the court in directing a verdict in favor of the Hospital.

In August, 1936, Mrs. Blankenship, who was then thirty-five years of age, experienced a bleeding and discharge from the vagina, and upon examination by her physician, Dr. Curry, of Covington, was found to be suffering from cancer affecting the reproductive organs. She was referred by Dr. Curry to the late Dr. Eugene Johnson, of Memphis, who removed the uterus, ovaries and tubes. In March, 1937, there was a recurrence of the trouble, and she was again referred by Dr. Curry to Dr. Johnson, who cauterized the affected tissue and advised a course of X-ray treatment. The plaintiff and her husband then engaged the Baptist Memorial Hospital to administer these treatments, and were referred to the X-ray department of the Hospital, where they first met and came in contact with Dr. J. E. Whiteleather, who was in charge of the X-ray department. On that occasion ten X-ray treatments were administered over a period of eleven days beginning on March 12th and ending on March 22nd, at which time 1500 roentgens were administered through two fields, front and back, which Dr. Whiteleather thought was a sufficient dosage, and which seemed for a time to arrest the cancer. In September,

1938, which was about a year and a half after the first treatments were administered, there was a second recurrence of the trouble, and Dr. Curry referred the plaintiff to Dr. Robert C. Taylor, who had succeeded to the practice of Dr. Johnson, then deceased. Dr. Taylor advised further X-ray treatments and the plaintiff and her husband again employed the Baptist Hospital to administer them. These treatments were administered by Dr. Whiteleather over a period of fourteen days through four fields, on alternate days, through the right and left quadrants of the abdomen and the right and left quadrants of the lower back. The daily dosage was 300 roentgens through the right and left portals on alternate days and the aggregate dosage administered was 2100 roentgens, which Dr. Whiteleather deemed necessary in order to kill or permanently arrest the growth of the cancer cells. This dosage was administered through a round cone 10 centimeters in diameter covering a field of approximately 80 square centimeters at a target distance of 60 centimeters, instead of 50 centimeters as administered in the previous treatments. This increase in the target distance gave an increased penetration of the rays without increasing the skin reaction. The cone was pressed directly against the body of the patient when the treatments were given and at such angle that the rays were transmitted directly towards the cervix. The cone used is the Failla cone and is the type used by the Memorial Cancer Hospital of New York which is said by Dr. Whiteleather and numerous other X-ray specialists who testified in the case to be the leading hospital for the treatment of cancer in America. These cones are of different sizes and shapes, round, oval, square or rectangular in shape according to the size and shape of the area to be treated.

The machine used in the treatment of the plaintiff was manufactured by the General Electric Corporation of Chicago, which is said to be the leading manufacturer of equipment for X-ray treatment in the world. When purchased in 1937 it was the very latest type of equipment manufactured by that company, and was purchased by Dr. Whiteleather for the Baptist Hospital after very careful and thorough investigation of the various types of equipment sold and in use in the leading hospitals of the country. The machine contains certain automatic features which render it impossible to start until all factors as to dosage and time of exposure are set and which electrically stop the machine when the dosage has been administered.

Dr. Whiteleather graduated in medicine at the University of Cincinnati, a class A medical college, in 1931, and has specialized in the field of roentgenology and radiology since that date, and has been at the head of the X-ray department of the Baptist Hospital since July 1, 1936. He is employed by the Hospital and has no private practice. Ten prominent Memphis physicians, seven of whom are specialists in roentgenology, testify in terms of highest praise of his ability and of his qualification as a roentgenologist.

The plaintiff is shown to have been a large woman, of rather low stature, but quite fleshy, weighing 160 to 170 pounds, and having what is described as a large pendulous abdomen. Because of her size it was necessary for the X-rays to penetrate to a depth of about four inches in order to reach the cancerous growth. The pathological test showed that the type of the cancer was what is known as "squamous cell carcinoma, grade 4, of the uterine cervix" which is the most fatal type of cancer involving the female genital tract. It is the type of cancer that

spreads very rapidly and unless arrested promptly will get into the lymphatics or into the blood stream, and when this happens nothing can be done. All the physicians agreed that this is true, and that, unless arrested, a cancer of this type will result in death within 12 to 18 months.

With the knowledge that this was squamous cell cancer, grade 4, and that the previous administration of 1500 roentgens had been insufficient, Dr. Whiteleather determined to administer 2100 roentgens through four portals instead of two, in rapid sequence so as to build up the dosage in as short a time as possible. This was necessary because it is known that where the cancer is only arrested by X-ray treatment and there is a recurrence of it, it becomes more resistant to X-rays and a greater dosage is required.

Dr. Whiteleather testified that in such a case the first consideration is to kill the cancer by giving a sufficient dosage ''or if he does not give a sufficient tumor dosage the patient will surely die.'' He further testified that the X-ray reaction to skin and body tissues varies in different individuals and that it did not ordinarily result from the administration of 2100 roentgens, but he deemed it more important to kill the cancer than to prevent a third degree reaction to the skin, and that he would cause such a reaction in order to kill the cancer. He also stated that a third degree burn, or more properly speaking, a third degree reaction, could be cured if properly treated.

He testified that there was no overlapping of the X-rays on the midline; that the cone was placed directly against the body of the patient, that no rays were applied outside of the cone area, and that the areas through which the rays were administered on the right and left side of the abdomen were approximately 4 inches apart and that

there could not have been any overlapping of rays on the midline. All the doctors agree that there is a certain amount of what is called "back scatter" or indirect radiation, or reflection of the rays which cannot be controlled.

The plaintiff felt no burning sensation and noticed no discoloration of the skin until September 30, 1938, which was the day before the last treatment. On that day when taking a treatment on her back she called the attention of one of the nurses to the fact that the skin on the abdomen was slightly yellow. She took her last treatment on October 1st and still felt no ill effect from the treatments, but about a week later a large blister appeared on her abdomen and one on her back. These passed away, however, except for an area on the abdomen about the midline about the size of a teacup. This was diagnosed as a third degree burn which finally ulcerated with a sloughing off of the tissue and which has not responded to treatment. She was first treated by her local physicians, Dr. Curry and Dr. Roby, and she was finally returned to Dr. Taylor for surgical treatment, but the stitches would not hold, and while the ulcer has become smaller it has never healed. She has suffered greatly and has had to take morphine to relieve her pain and there is some evidence that she has become an addict to that drug.

She has not suffered any vaginal hemorrhage since the last X-ray treatments and the cancerous condition has certainly been arrested up to the time of the trial, approximately 2½ years, if it has not been permanently cured.

Dr. Burton A. Rinehart, of Little Rock, testified as a roentgenologist for the plaintiff. He testified that the standard practice used "more or less universally by all the X-ray specialists in the United States, and in the rest

of the world too, in the treatment of cancer of the cervix is to give all the X-ray possible to the cancer" without damaging any of the normal structures; and that "the first consideration is never to damage the skin beyond repair." He testified that in treating cancer of the cervix it was necessary for the rays to penetrate to a depth of four inches and that in going through the body tissues a considerable part of the rays is absorbed so that only about 40 per cent of that applied to the skin penetrates to the cancer; and for that reason it is customary to shoot the ray beams through four different areas so as to give a dosage of 160 percent of the dosage at the depth of four inches without giving an excessive dosage at the surface. He testified that he uses, and that it is the standard practice to use, a lead rubber shield ¼ inch thick with four windows or openings 10 x 15 centimeters in it, which shield or apron is laid over the body of the patent so as to prevent the rays from entering the body anywhere except through the openings. The rays are trasmitted through the four areas separately, two from the front and two from the back; the X-ray tube is fixed at a distance of 50 centimeters from the area to be treated and 1500 roentgens administered through one-half millimeter of copper filter by 200,000 volts of electricity. With this filter the skin will stand 1500 roentgens at each of the four areas. To prevent any overlapping of the rays and thus prevent any injury to the skin the midline is protected by the rubber shield. Dr. Rinehart says: "That is the standard procedure that I am describing. There is not any division there. Everybody uses it".

And again he says:

"In every roentgenologist association or society that I know of, the practice is followed exactly as I have described, exactly like this one (referring to the lead rubber

shield). It is used by practically every roentgenologist in the country in treating this type of cancer. The use a 10 x 15 centimeter or 4" x 6" area like this here.''

Dr. Rinehart did not see Mrs. Blankenship until a few days before the trial, or about two years and four months after the administration of the second series of X-ray treatments. He gave it as his opinion that the ulcer was due to the overlapping of the X-rays on the scar tissue on the midline resulting from the operation for the removal of the uterus, that scar tissue was much more susceptible to X-ray burns than other tissues because of the lack of blood circulation through scar tissue, and that he would not administer 1500 roentgens through scar tissue. He gave it as his opinion that 1500 roentgens was the maximum safe dosage when given through a filter of ½ millimeter of copper and one millimeter of aluminum, (which was the filterage used by Dr. Whiteleather), and that 1500 or 2300 roentgens would be in the danger zone, and 2300 roentgens the absolute top dose.

He stated that the hospital charts exhibited indicated that a round cone had been used by Dr. Whiteleather; that it was not standard practice to use round cones in the treatment of cancer of the cervix, and that he knew of no competent roentgenists who used them. He never heard of the Failla cone; he knew of the Memorial Hospital of New York City but did not know that it was recognized as one of the outstanding institutions in America for the treatment of cancer, and he did not recognize Failla as an authority because he was a physicist and not a physician, and that the Failla cone shows his ignornance because you can't treat cancer of the cervix with a round cone.

It thus appears that there is an irreconcilable conflict between the views of Dr. Rinehart and those of Dr. Whiteleather in respect to the proper method of treat-

ment of cancer of the cervix by X-ray therapy. The reasons for their divergent views are stated with much earnestness, and prominent roentgenologists and hospitals are cited by each as examples supporting their respective views. This is doubtless due in large measure to the fact that the field is yet new and that much is yet to be learned about the subject. According to the proof the field of deep therapy by X-rays has practically developed in the last decade and has changed completely since the world war, due to the advanced equipment.

Dr. Rinehart is positive in his conviction that it is more important to prevent damage to the skin of the patient by a third degree reaction than it is to kill the cancer, because the third degree reaction is worse than the cancer; while Dr. Whiteleather and the other specialists who testified for the defendants are of opinion that the first consideration is to kill the cancer even at the risk of causing a third degree reaction, because if there is not sufficient dosage to kill the cancer the patient will surely die in a short time, while the third degree reaction can readily be cured by plastic surgery.

Dr. Rinehart says:

"A. (If radium could not be used) the patient would die if I could not cure the cancer without injuring the patient.

"Q. You mean you would let your patient die of cancer rather than injure the skin? A. That is accepted all over the world, yes.

"Q. What is accepted, Doctor? A. That you may not kill (burn) the patient in order to cure the cancer.

"Q. That you may not damage the skin in order to cure the cancer? A. That is right. We have found out, not only through our experience, but the experience of X-ray men all over the country, that these X-ray burns

are just as bad or worse than the original cancer, and there is no reason to give them these X-ray burns, because they are more painful.

"Q. Do I understand you to say that the X-ray burn is as bad as the cancer? A. That is right."

The witness was, of course referring to third degree burns and said that such a burn was more painful than cancer and might possibly go into cancer itself.

Dr. Whiteleather after stating that the first consideration was to kill the cancer cells even if in doing so it became necessary to cause a skin reaction, said:

"A. Well, our first job is to kill the cancer, and that is what we want to do first, and if in doing that, in order to achieve that aim, you do burn some skin, it is a matter that can't be helped.

"Q. Doctor, when you have a recurrence, is that at times necessary in order to give the necessary dosage to kill carcinoma of the cervix, and particularly the recurrent type? A. It is quite usual to get reaction to the skin.

"Q. And is this a subject that has given the roentgenologists of the country some concern? A. Yes, sir . . . it is a subject that has been discussed by numerous experts."

Dr. J. Cash King, one of the leading specialists in roentgenology in Memphis, testified that the squamous cell type, grade 4, of cancer is one of the most malignant forms of cancer, and "the patient is sure to die in one year if untreated." He stated that deep X-ray therapy was regarded as the best treatment for such condition but that if sufficient dosage was not given the patient would show an improvement for a time, and there would be a recurrence of symptoms, and if immediate treatment was not then given the patient would die of cancer. As he expressed it, "you have to immediately take the most

radical methods if you hope to save the life of your patient.'' Under such treatment you would in all cases expect some skin reaction and in a small percentage of cases you have third degree reactions. He stated that he would intentionally cause a third degree reaction to the skin if it was necessary to do so in order to kill the cancer. He stated that such reactions were not incurable, that he had seen many that were cured without surgery if they did not cover too large an area; and that large areas could be cured by plastic surgery.

Some eight or nine other specialists in radiology and surgery testify to the same general effect and say that in their opinion 2100 roentgens administered as Dr. Whiteleather administered the treatment in this case was well within the range of safety.

■ In view of this divergence of opinion among the specialists it cannot be said that it should be left to a jury of laymen to determine which method of treatment is right, which would be the effect of saying that the court erred in directing a verdict for the defendant Hospital in this case.

■ A correct statement of the law with reference to the standard of skill and care required of physicians and surgeons as contained in 21 R. C. L., ''Physicians and Surgeons,'' Sec. 27, is that the physician or surgeon ''must possess that reasonable degree of learning, skill and experience which ordinarily is possessed by others of his profession; and that he must exercise reasonable and ordinary care and diligence in the exertion of his skill and the application of his knowledge, and exert his best judgment as to the treatment of the case intrusted to him;—in short, a physician is bound to bestow such reasonable and ordinary care, skill and diligence as physicians and surgeons in the same neighborhood, in the

same general line of practice ordinarily have and exercise in like cases.''

And this is the rule applicable to roentgenologists and X-ray technicians. Id., Sec. 31.

■ There is no claim that Dr. Whiteleather did not possess the requisite learning and skill, or that he made any error in diagnosis, or that he neglected the patient after the treatments; the only claim is that he gave the patient an excessive dosage. All the proof is that he was of opinion that his patient would surely die if a sufficient dosage was not administered to kill the malignant growth, and that a dosage of 2100 roentgens was necessary for this purpose, and this was the dosage he gave. If an excessive dosage was given it was due to an error of judgment and not to negligence. As said in Casenburg v. Lewis, 163 Tenn., 163, 40 S. W. (2d), 1038:

''It is the physician's privilege to decide between one of two or more courses in the treatment of his patients and, as said by the Court of Appeals, he could not be held responsible for an erroneous exercise of judgment.'' 162 Tenn., at page 168, 40 S. W. (2d), at page 1040.

In Snyder v. St. Louis Southwestern R. Co., 228 Mo. App., 626, 72 S. W. (2d), 504, 512, the court said on this question:

''We have found no better statement of the rule of care required of a physician than in the case of Bailey v. [St. Louis-San Francisco] R. Co. (Mo. App.), 296 S. W., 477, cited by plaintiff, where this court, speaking through Judge Cox, said:

'' 'Physicians and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, but he must often use his own

best judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence . . . , even though his judgment may prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken. [Citing cases.]' "

■ And where there is a difference of opinion among physicians or surgeons with reference to the treatment to be given in a particular case, a physician will not be held liable for malpractice if he follows the course of treatment advocated by a considerable number of physicians of good standing in his community. It would not be competent for a court or jury in such a case to say that a physician who followed either of said different methods of treatment was negligent.

Moscicki v. Shor, 107 Pa. Super., 192, 163 A., 341, 344, was an action against a dentist charging negligence in pulling 23 teeth at one time, with bad results to the health of the patient. The court found that competent medical authority was divided upon the question whether it was proper practice to pull 23 teeth at one time, but that the practice employed by the defendant was that followed by "a considerable number of his professional brethren in good standing in his community," and that it was error to submit the case to the jury. The court said:

"Every physician or surgeon is answerable for an injury to his patient resulting from the want of the requisite knowledge, care, and skill, or the omission to use reasonable care and diligence, or for a failure to exercise his best judgment. But the same public interest requires

that the practitioner should not be held liable who acts in accordance with the practice followed by a considerable number of his professional brethren in good standing in his community. One of the elementary principles involved requires the physician or surgeon to have due regard to the advanced state of the profession at the time, which implies that useful improvements in method of treatment will be a departure from what the majority have theretofore held. 'It is not for the court or jury to . . . determine whether that system is best, nor to decide questions of surgical science in which surgeons differ among themselves.' Remley v. Plummer, supra [79 Pa. Super., 117, 122].''

In Callahan v. Hahnemann Hospital et al. (Cal. App.), 26 P. (2d), 506, 510, the defendant surgeons appealed from a verdict and judgment against them for alleged negligence in the selection of the method of treatment of the plaintiff following an appendicitis operation. After stating that it was ''a matter of common knowledge that such selection (of the method of treatment) is a matter of judgment and opinion upon which the most skillful members of the medical profession will often honestly differ'', the court states the rule to be that

'' 'A physician is required to possess only ordinary skill in his profession and to use his best judgment in the exercise of that skill, and, if he complies with these requirements, he is not liable for the nonsuccess of his treatment.' Linn v. Piersol, 37 Cal. App., 171, 173, 173 P., 763, 764. This rule, with certain limitations, has been quite generally followed in cases involving the charge of unskillfulness in the selection of a method of treatment. [Citing authorities.] . . . ''

After stating that no witness for the plaintiff had testified as to what was the recognized and approved treat-

ment of the condition in which the appellant found the patient, the court says:

"But, even assuming, for the purpose of this discussion, that Dr. Housman had testified that in his opinion there was but one recognized and approved method for the treatment of such condition, which method was other than the one followed, we still believe that the evidence was insufficient. In the opinion of several other medical experts whose testimony stands unimpeached, the method selected by appellants was the recognized and approved method of treatment for such condition. In other words, if Dr. Housman's opinion may be said to be in conflict with the opinions of the several medical experts called by appellants, the case presented was one showing that the medical experts were at variance in their opinions as to the method of treatment which should have been employed. Under these circumstances, we are of the opinion that appellants could not be held liable if they acted within 'the reasonable limit of either opinion.' Dahl v. Wagner, supra, 87 Wash., 492, 151 P., 1079, at page 1080. As was said in the last-mentioned case: 'It has been the uniform holding of this court that where doctors of equal skill and learning, being in no way impeached or discredited, disagree in opinion upon a given state of facts, the courts cannot hold a defendant in a malpractice suit to the theory of one to the exclusion of the other. . . . It is enough if the treatment employed "have the approval of at least a respectable minority of the medical profession who recognized it as a proper method of treatment." ' " "

In Staloch, Adm'r, v. Holm, 100 Minn., 276, 111 N. W., 264, 267, 9 L. R. A. (N. S.). 712, the question presented was whether or not the evidence justified a verdict against a surgeon upon the ground of negligence in the manner

of performing an operation. In holding that there was no evidence which warranted the submission of the case to the jury the court, in a scholarly opinion said:

"Physicians and surgeons deal with progressive inductive science. On two historic occasions the greatest surgeons in our country met in conference to decide whether or not they should operate upon the person of a president of the United States. Their conclusion was the final human judgment. They were not responsible in law either human or divine for the ultimate decree of nature. The same tragedy is enacted in a less conspicuous way every day in every part of the country. . . . Shall it be held that in such cases, where there is a fundamental difference among physicians as to what conclusion their science applied to knowable facts would lead to, then what they with their knowledge, training, and experience are unable to decide, and what, in the nature of human limitations, is not susceptible of certain determination, shall be autocratically adjudged by 12 men in a box, or by one man on the bench, or by a larger number in an appellate court, none of whom are likely to have the fitness or capacity to deal with more than the elements of the controversy? All the court can properly do if an action for negligence should be brought in such a case would be to direct a verdict for the physician."

In Jackson v. Burton, 226 Ala., 483, 147 So. 414, 416, the plaintiff fell from a swing and broke her arm; both bones were broken and protruded through the flesh. The wound became infected and amputation became necessary. Dr. Clayton, the family physician took her to a hospital and placed her in the care of Dr. Jackson, the hospital physician, and recommended that "wet dressings" be applied; but Dr. Jackson, the hospital physician

applied "dry dressings." It was charged that this was negligence. The court said:

" 'Where there are various recognized methods of treatment the physician is at liberty to follow the one he thinks best and is not liable for the malpractice because expert witnesses give their opinion that some other method would have been preferable'. [Citing cases.]

"The experts all agreed that the wet and dry methods in such cases are both used by skillful physicians, and that standard authorities approve them both; that it is largely in the sound discretion of the surgeon in charge of the case. Defendant was shown to have been a competent surgeon and used the method adopted by him with care and skill, and the wound continued to drain to the last, and did not seal up. This is the result the best process was expected to secure. For so doing, he is not chargeable with want of due care."

In Duckworth v. Bennett, 320 Pa. 47, 181 A., 558, 559, the defendant was sued for negligence in failing to make an X-ray examination in diagnosing an injury to the plaintiff's leg. The plaintiff fell as a result of his knee giving way. Defendant treated him for arthritis. Eight weeks later it was discovered that there was also a trouble with the hip which an X-ray examination would have revealed. It was held that the failure to make an X-ray examination was insufficient evidence of negligence to take the case to the jury. The court said:

"Here, the doctor used his skillful fingers and trained observation to detect what was wrong. Neither court nor jury would be competent to set up an opinion counter to his, unless much more was shown than here appears. At most, all that could be said is that defendant had made a mistake in diagnosis where the symptoms were obscure, and for this there is no liability. English v. Free, 205

Pa., 624, 55 A., 777; Remley v. Plummer, 79 Pa. Super., 117. Where competent medical authority is divided, a physician will not be held responsible if, in the exercise of his judgment, he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in his community. Id. A physician is required to exercise only such reasonable skill and diligence as is ordinarily exercised in his profession. Saltzer v. Reckord, 319 Pa., 208, 179 A., 449.''

In Walkenhorst v. Kesler, 92 Utah, 312, 67 P. (2d), 654, 668, the court says:

''That the treatment did not effect a cure is not a cause of action. Because one does not diagnose or treat a patient in the same way as another or use the other's methods, will not constitute a malpractice, if the treatment employed has the approval of at least a respectable portion of the profession or is in accord with the standards of those recognized in the community to treat such ailments, and reasonable skill, learning, and diligence are manifest. Physicians or others authorized to treat human ailments are not insurers of a cure.''

And in Maxwell v. Howell (W. Va.), 174 S. E., 553, 554, it is said that

''If there are two or more approved methods of treatment of an injury committed to his care, the surgeon may adopt the one which, in his honest opinion, will be the more efficacious and appropriate under all the circumstances, and in such case he is not liable for any injury resulting from an error in his judgment, if there be one. He is not bound at his peril to adopt the best method.''

And in Gruginski v. Lane, 177 Wash., 121, 30 P. (2d), 970, it was held that a surgeon's treatment of a compound fracture of the humerus would not constitute negligence if the treatment actually employed had the approval of at

least a respectable minority of the medical profession and was recognized by such as the proper method.

We think the reasoning of these cases is sound and that they are determinative of the question before us. We hold, therefore, that there was no error in the action of the trial judge in directing a verdict for the defendant hospital. In view of this conclusion it becomes unnecessary to consider the other questions discussed in the briefs.

Judgment affirmed at the cost of the plaintiff and her surety on the cost bond.

Anderson, J., and Adams, S. J., concur.