**Barbara CAMPBELL, Plaintiff-Appellant,**

v.

**Peter OLIVA, M.D., Defendant-Appellee.**

**No. 19810.**

United States Court of Appeals,
Sixth Circuit.

April 22, 1970.

N. Eugene Worthington, Madisonville, Tenn., J. D. Lee, Madisonville, Tenn., Charles R. Terry, Morristown, Tenn., on the brief, for appellant; Reed & Terry, Morristown, Tenn., of counsel.

C. T. Herndon, III, Johnson City, Tenn., J. Paul Coleman, C. T. Herndon, III, Johnson City, Tenn., on the brief, for appellee; Simmonds, Herndon, Johnson & Coleman, Johnson City, Tenn., of counsel.

Before WEICK and EDWARDS, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

The only question in this appeal is whether the District Court erred in granting defendant's motion for a directed verdict, made at the close of all of the evidence.

The suit was against a plastic surgeon for damages for malpractice in his diagnosis, treatment and surgery of plaintiff's jaw. Jurisdiction was based on diversity of citizenship.

The substantive issues of this case are governed by Tennessee law. The procedural issues are controlled by Federal law. In the Federal Courts, factual issues are decided by the jury and not by the Court. Byrd v. Blue Ridge Rural Elec. Co-Op., Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

In the consideration of a motion for a directed verdict made by the defendant at the close of all the evidence, the Court is required to view the evidence, as well as all inferences properly deducible therefrom, in the light most favorable to the plaintiff. Taylor v. Cirino, 321 F.2d 279 (6th Cir. 1963).

The Supreme Court of Tennessee, in construing Art. VI § 9 of the Tennessee Constitution, held that it "was intended to preserve to the jury 'the right to determine what facts are proved in a cause.' Ivey v. Hodges, 23 Tenn. (4 Humph.), 154, 155." Haskins v. Howard, 159 Tenn. 86, 97, 16 S.W.2d 20, 23 (1929).

In Cantrell v. Railway Co., 90 Tenn. 638, 18 S.W. 271 (1891), it was held:

"For the Court to direct the jury to return a verdict in favor of either party, where there is *any* conflict in the evidence, is an invasion of the province of the jury by the Court, for which the case will be reversed." (Italics ours) (Syl. 4)

The plaintiff, Barbara Campbell, was a minor, who, with her husband, was attending East Tennessee State University at Johnson City, Tennessee. On September 20, 1967, while frolicking with her husband, she received an accidental blow on the left side of her face. Numbness developed for a short time. Six days later she awoke with pain in her left jaw. She consulted Dr. Burgin Dossett, Jr., an internist at the University Clinic. Dr. Dossett sent her to Memorial Hospital, where x-ray pictures were taken of her jaw by Dr. J. J. Range, a radiologist, admittedly qualified by education and experience to read and interpret x-ray pictures. Dr. Range interpeted the x-rays and reported them as negative for fractures and reported further that the left temporomandibular joint appeared normal. Dr. Dossett informed Dr. Oliva of this reading.

The pain did not subside. Dr. Dossett was unable to open Barbara's mouth wide enough to insert a tongue depressor. On October 15th Dr. Dossett referred Barbara to the defendant, Dr. Peter Oliva, who specialized in the practice of plastic surgery, in the area of Johnson City. Until she consulted Dr. Oliva,

Barbara had received no treatment by Dr. Dossett except analgesics for pain.

When Barbara consulted Dr. Oliva on October 15th, she handed the x-rays to him, but did not see him examine them. He opened and closed her mouth and asked her when she had pain. He told her she had a fracture of the left condyle and that it would have to be repaired by surgery. The following day, October 16th, Oliva saw her again and injected the area of the left condyle with drugs in order to mobilize it. He also inserted a needle in the area by the use of which he claimed to be able to diagnose that there was a fragment, or a fracture, or a detached condyle. The drugs did not alleviate the pain. He testified that he was unable to move the upper joint and could move the lower only half a centimeter. This procedure consumed from thirty to forty minutes.

He testified:

"It was then obvious to us that we had a fracture here, or we had a detached condyle, or we had a fragment that needed to be removed in order to relieve her pain."

He testified further:

"This is when we informed the patient that she had either a fracture or a chip there and that an operation was going to be needed to explore the area and see what needed to be done."

His interpretation of the x-rays was:

"There was a question, irregularity there, that usually is not present."

The fact that the doctor did not state which of the three different conditions was obvious to him, and his admission of the question or irregularity in the x-rays, would seem to indicate the necessity of taking additional x-rays before performing the operation. Oliva said that he explained to Barbara what type of operations could be done, depending on what was there. His frequent use of the pronoun "we" throughout his testimony referred to himself, as he alone performed the surgery.

Barbara testified that she "asked him [Oliva] why he knew right away that I had a fracture when at the hospital they said it was not fractured and he said that they didn't know how to read x-rays at the hospital."

Barbara further testified that Oliva told her it would be a very minor operation and that she would be up and able to eat within three or four days, and could return to school the following Monday after the operation. He told Barbara and her mother that he would make a small incision on the left side of her face and repair the condyle. Barbara's mother and husband testified that he told them substantially the same thing. They testified that Oliva did not tell them that he was going to operate on both left and right condyles. But on his own office record, Oliva made a notation on October 16 that if her condition did not improve he "will resort to a bilateral condylectomy."

Oliva performed the surgery on Barbara on October 26, 1967. He wrote the following findings and procedure in the hospital record:

"This patient had had a blow approximately six weeks prior and has had severe trismus with difficulty TM joint pain."

Procedure, "Under suitable general anesthetic the patient was prepped and draped in the usual manner. Through a curved incision in the right temporal, the condyle was exposed and the condyle was removed in routine manner. Following adequate repair, the capsule was closed, and routine plastic closure carried out utilizing 4–0 plain and 6–0 nylon. Sterile dressing was applied. The patient tolerated the procedure well and was sent to the recovery room in good condition. This was done bilaterally." (App. at 248)

The record would seem to indicate that Oliva first repaired the right condyle, which was healthy and actually required no repair work. He then operated on the left, which he thought was fractured, or dislocated, or fragmented. His testimony, however, contradicts the

record, for he testified that he operated first on the left condyle.

He testified that the top portion of the left condyle was stuck. He removed the left condyle and clipped it. This, he testified, shortened the condyle and would cause a cross bite. He testified that in order to effect a balance between the condyles, he operated and clipped the healthy right condyle so that both condyles would be of the same length. The trouble with this latter procedure is that it resulted in an open bite. She now has occlusion on only four teeth in the back of her mouth, i.e., on the rear two teeth on each side; there is no contact whatsoever with the front teeth. She is unable to close her mouth and it remains open. This condition is permanent. She continues to suffer pain. She can open her mouth only about $11/16$ of an inch. The normal opening is one and one-half to two inches. She can eat only soft food.

Oliva prescribed an Ace bandage in order to bring her teeth into occlusion, but it did not work. He also told her to chew gum. She saw Oliva about four times after the surgery, and then she consulted Dr. Carl Sammarco, an oral surgeon, at her home in New Jersey. Dr. Sammarco prescribed a wiring process in an attempt to bring the teeth into occlusion.

At the trial there was read into evidence the deposition of Dr. Carl Sammarco, who practiced in Asbury Park, New Jersey. He testified that he called Dr. Oliva on the telephone and asked him why he had done a bilateral condylectomy, and that Oliva replied it was to balance the joints. Sammarco told Oliva that was rather unusual. Oliva disagreed and said it was not unusual and that there was nothing to worry about because the condyles will grow back. Oliva did not, however, name any such operation that he had ever performed. In some forty or fifty fractured condyles treated by Dr. Sammarco, he found it necessary to operate on only one. Dr. Sammarco testified that the x-rays of Barbara showed two normal condyles. He could not see how Dr. Oliva could determine by clinical examination the presence of a fragment which was not large enough to appear on an x-ray. Sammarco testified that he had never heard of doing a condylectomy on a normally functioning joint.

Dr. Sammarco further testified that an Ace bandage, as prescribed by Dr. Oliva, had long been discarded as useless to bring about occlusion.

Two oral surgeons, Dr. Carson Blevins and Dr. Edwin Smith, from the area of Johnson City, Tennessee, were called as expert witnesses for plaintiff. Both doctors testified that they were familar with the practice of oral and plastic surgery as it pertains to the area of the jaw, in the locality of Johnson City.

Dr. Carson Blevins testified that as a result of the operation, Barbara could open her mouth only about $11/16$ of an inch; the normal opening is one and one-half to two inches. In answer to a hypothetical question, he testified that anyone who does condylar fractures should know that the choice of treatment is a conservative approach to start with. Since there was no evidence of a fracture in the x-rays he felt that radical surgical treatment was unjustified. He testified:

"  *   *   * if you don't get the occlusion back where the patient can use the jaws as they are supposed to be and function properly, everything else is lost. I do feel this patient should have been—the jaws and teeth should have been put back in proper relationship immediately or before the patient left the hospital and maintained there. But I want it known, first, I don't think the surgery should have been done."

The doctor based that conclusion—

"  *   *   * because there was no evidence of a fracture on the X-ray and from the history and from what I read in the hospital records, I could see no reason for radical surgery."

He was of the view also that further x-rays should have been made and consultation had before radical surgery.

Dr. Smith defined oral surgery as

" * * * that part of dentistry that deals with the diagnosis, surgical and adjunctive treatment of injuries, disease, malformations of the human jaws and associated structures."

Dr. Smith was of the opinion that Oliva did not exercise the degree of care and skill possessed by practitioners of similar skill in the area. He questioned "the diagnosis of a fracture that waited six days to hurt." He was of the opinion that the treatment plan was "radical, fracture or not."

Both oral surgeons also testified in response to questions by the Court, that Oliva did not exercise that degree of care and skill possessed by other surgeons in the locality.[1]

Oliva had qualified to practice in Memorial Hospital. He had consulted the hospital radiologist, Dr. Range, in connection with other cases when there was a question about the x-rays, but did not consult him about Barbara's x-rays nor his interpretation of them, notwithstanding the fact that he (Oliva) claimed there was an irregularity. This seems significant, particularly since he did not agree with Dr. Range's interpretation. Furthermore, Oliva had plenty of time to obtain additional x-rays of the left jaw, as the surgery was not performed until ten days later, on October 26th. Oliva did order other x-rays, not of Barbara's left jaw, but of her chest. Oliva did not consult with any of the oral surgeons in the area who specialized in the treatment and setting of fractured jaws, or with anyone else.

Oliva testified that ankylosis and fibrosis of the left jaw had developed, which necessitated the operation. These conditions were not shown on the x-rays. However, even though such conditions might not appear on x-rays, they would seem to be quite significant, and the conditions, if they existed, ought to have been noted in the hospital record; but they were not.

The defense called Dr. Dossett, the internist, who testified concerning his examination and treatment of Barbara. He said he "felt sure that she had a fracture in the area of the temporomandibular joint where the bone was." He did not qualify as an expert in the reading of x-rays or in oral or plastic surgery. The record does not reveal when he made the diagnosis, or that he ever advised his patient of his diagnosis.

The defense called two plastic surgeons, Drs. Claringdon and Jerome, to testify. They were from Memphis, Tennessee, about six hundred miles from Johnson City. In qualifying them as expert witnesses, defense counsel asked them if they were familiar with the standard of care as regards plastic surgery or the degree of care and skill required of a plastic surgeon practicing his speciality in Johnson City, Tennessee, and they both testified that they were. It should be remembered that Dr. Oliva was the only plastic surgeon in that area, and therefore his standard of care could not be compared with that of any other plastic surgeon in that locality. It could be compared with that of

1. The testimony of the three oral surgeons as to proper practice conforms to that approved by Laszlo Schwartz, D.D.S., in "Disorders of the Temporomandibular Joint," where the author states:

"Following unilateral condylectomy or resection the function is generally good. During opening the mandible usually deviates to the operated side with upward tilting in some cases. However, the occlusion is generally normal. Sometimes, however, such upward tilting of the mandible on the operated side causes traumatic occlusion and an open bite on the opposite side. To counteract this treatment should be instituted as soon as possible after the operation to secure the best possible occlusal balance, if necessary by prosthetic correction. *Bilateral resection is, however, inadvisable,* owing to a tendency for backward movement of the mandible with tilting, causing the opening of the bite anteriorly, and making it difficult to obtain a satisfactory occlusion." (p. 275) (Italics ours)

oral surgeons in the area who specialized in surgery of the jaw and with that of plastic surgeons in other areas of the state.

The District Judge recognized the problem, stating that the rule in Tennessee is that—

> " * * * the standard required of the defendant was that he possess [and exercise] the degree of skill and ability ordinarily possessed [and exercised] by men [and women] engaged in the practice of medicine and surgery in the same locality * * *. Haskins v. Howard, 159 Tenn. 86, 95, 16 S.W.2d 20."

The District Judge was of the view that an exception to the rule should be made and resort had to the standard in a wider area but still encompassing Johnson City. On this theory he admitted the testimony of the two Memphis experts and excluded opinion testimony of the New Jersey oral surgeon (who was not much farther away than Memphis), relative to the standard of care.

The District Judge admitted the testimony of two local oral surgeons skilled in surgery of the jaw because the two professions appeared to him to overlap in the area of the diagnosis and treatment of injuries to the jaw.

Dr. Claringdon testified, in answer to a hypothetical question, that there are three ways of treating a condylar fracture that has become stuck: unilateral, or one side condylectomy; bilateral, or both sides; or unilateral with attempt to reconstruct the joint; that the third method is of more recent origin; and that a unilateral ends up with "maybe a cross bite". A bilateral "will most probably end up with an open bite due to vertical shortening of the bones."

The opinion of Dr. Claringdon as to choice is weakened because he admitted that he had never performed a bilateral condylectomy. He said it was an unusual case and he had never seen one of them. The testimony as to the unusual case conflicted with the statement made by Dr. Oliva to Dr. Sammarco, to the effect that bilateral condylectomies were usual.

The hypothetical question put to Dr. Claringdon also included the assumption that fibrosis and ankylosis were present, which presence, as previously pointed out, was in dispute. If they were not present, his opinion would be different.

The other plastic surgeon called by the defense was Dr. Jerome, who was Chairman of the Department of Plastic Surgery at the University of Tennessee Medical College, in Memphis. He also engaged in the practice of plastic surgery. He taught Dr. Oliva when he was a student in that University, and described Dr. Oliva as one of his best students.

Dr. Jerome defined plastic surgery as—

> " * * * that branch of surgery which has the objective of either improvement in appearance or improvement in function."

This definition is broad enough to embrace practically all fields of surgery. In establishing his qualifications as an expert, Dr. Jerome testified that he reviewed 1700 facial fractures within a period of ten years. He could not answer a question on cross-examination as to whether a bilateral condylectomy was involved in any of the 1700 cases.

Referring to late fractures of five weeks, he said: "I have never seen one in my entire experience." In all of his extensive experience, he never performed a bilateral condylectomy. Nevertheless, Dr. Jerome testified that Dr. Oliva's procedure was correct. In answer to a hypothetical question, he testified:

> "First of all, it should be very apparent at this late date, I think, about five weeks post-trauma, is that correct? That this patient was unable to move her mouth; that she obviously had a fracture of the neck of the condyle, and not only did she have fibrosis and ankylosis, but I expect she probably had malunion due to the fact that she was unable to move her

mouth. There is nothing that could have been done except to go ahead and remove the condyle.

"There are several acceptable procedures. This is one which would be acceptable too. I must also point out that a fracture five weeks post-trauma, you must just as well say the ballgame is over. You have got to accept disability.

"You are trying to substitute a lesser disability for a greater disability. In other words, the complete locked jaw or frozen jaw, I can't think of anything more disabling than that.

"If you do a unilateral condylectomy, of course, the disability regarding a cross bite—that can be disabling. If you do a bilateral condylectomy, you are going to have an open bite. There isn't anything you can do for an open bite. That is something you have got to accept. I think it would be the lesser of the two disabilities." (App. at 311–312)

This testimony as to the seriousness of Barbara's condition conflicts with the verbal assurances given by Dr. Oliva to Barbara and her husband and mother, that the operation would be minor and that she would be able to eat and to return to school in three or four days.

The hypothetical question put to Dr. Jerome also contained the assumption that ankylosis and fibrosis were present. This presence was in dispute. The doctor testified that he would change his opinion if that condition was not present in fact.

Dr. Jerome admitted that a finding of ankylosis and fibrosis would warrant entry on the medical record.

The excised fragments of the condyles were submitted to the hospital pathologist, who found them "grossly unremarkable".

Oliva contends that the operative procedure which he followed was a matter of choice among competent physicians and that he cannot be held liable for malpractice in selecting one which in his best judgment was best suited to his patient's needs. Gresham v. Ford, 192 Tenn. 310, 241 S.W.2d 408 (1951); Ball v. Mallinkrodt Chem'l Works, 53 Tenn. App. 218, 381 S.W.2d 563 (1964): McPeak v. Vanderbilt Univ. Hosp., 33 Tenn.App. 76, 229 S.W.2d 150 (1950); Blankenship v. Baptist Memorial Hosp., 26 Tenn.App. 131, 168 S.W.2d 491 (1942).

■ It would seem to us that when the choice to be selected by the physician involved the serious consequences described by the Memphis plastic surgeons, i.e., the choice between a cross bite or an open bite, the patient ought to be consulted and given opportunity to consider and make the selection as to the one she preferred. According to the testimony of plaintiff, her husband and mother, this was not done. To the contrary, they were told by Oliva that the operation would be minor and that plaintiff would be able to eat and to return to school within a few days.

Furthermore, neither Doctor Claringdon nor Doctor Jerome (in his wide experience), who testified as to the choice of procedures, had ever performed a bilateral condylectomy, and therefore they had no experience with the operation. This rendered their testimony as to choice of procedures of little value.

In considering the motion for a directed verdict, the testimony as to the assurances given by Oliva, although it may be controverted in some respects, must be taken as true. It is for the jury, and not the Court, to determine the facts.

■ A physician stands in a position of trust and confidence with respect to his patient and he has a duty to exercise the utmost good faith. Ball v. Mallinkrodt Chem'l Works, *supra* 381 S.W.2d at 567; 41 Am.Jur., Physicians and Surgeons, §§ 73–75; 70 C.J.S. Physicians and Surgeons § 48m.

In *Ball*, the Court of Appeals of Tennessee approved the following instruction to the jury:

"It is also the duty of a physician or surgeon to disclose to the plaintiff facts which are necessary to form the

basis of an intelligent consent by the patient to the proposed treatment. Where the consequences are serious and substantially certain to occur, it is the physician's or surgeon's duty to disclose such facts to the patient. The physician may not minimize the normal operation in order to induce the patient's consent, at the same time the physician must place the welfare of his patient above all else, and the very fact places him in a position in which he must sometimes choose between two alternate courses of action, one is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote. This may well result in alarming a patient who is already unduly apprehensive and who may, as a result, refuse to undertake the surgery in which there is, in fact, minimal risk. It may also actually increase the risk by reason of the psychological result of the apprehension of it. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the elements of risk a certain amount of discretion must be employed consistent with the full disclosure necessary for an informed consent." (Id. at 567)

The appendix in this case contains what purports to be a copy of a consent to the operation, which was signed by the plaintiff and by her mother. Why it was signed by her mother instead of her husband does not appear. In the consent form the operation is described as "Exc.bil.condyles." There is no proof of the meaning of the words "Exc.bil.condyles" as used in the consent, or that their meaning was ever explained by anyone to the patient or her mother. The patient would not normally expect that the consent which she was asked to sign would differ from what her doctor told her. The consent also states:

"The nature and purpose of the operation, possible alternative methods of treatment and possibility of complications have been fully explained to me."

The doctor did explain to her that it was a minor operation, and that she would be able to eat and to return to school within a few days. He told her that he would repair the left condyle. He did not tell her that he intended to operate on her healthy right condyle; nor did he tell her of any choices he had, nor ask her which one she preferred. Contrary to the provisions of the "Consent", he did give her assurances as to the results.

■ Furthermore, the physician's privilege to decide between one of two or more choices in the treatment of his patient is conditioned upon the presumption that there was a *"careful diagnosis"*. Haskins v. Howard, 159 Tenn. 86, 16 S.W.2d 20 (1929), citing Burnett v. Layman, 133 Tenn. 323, 328, 181 S.W. 157 (1915).

In the present case there can be no such presumption. The question whether Oliva made a careful diagnosis was a disputed issue of fact for the jury to decide.

■ We think the Court was correct in admitting the testimony of oral surgeons who testified that they were familiar with the practice in the locality, of oral as well as plastic surgery as it related to injuries to the jaw. An issue of fact was present as to whether Oliva's diagnosis and procedures conformed to proper practice in the locality. In view of the conflict in testimony of the experts, this was for the jury to decide.

The defense questioned the propriety of the wiring of plaintiff's jaws by Dr. Sammarco. This likewise is a disputed issue of fact.

It would have been better practice in this case for the District Judge to have submitted the case to the jury. In the event that plaintiff obtained a verdict, he could enter judgment notwithstanding the verdict if he was of the opinion that plaintiff had not made out a case. On appeal, this Court could then finally

dispose of the case without the necessity of remanding for a new trial. Green v. Reynolds Metals Co., 328 F.2d 372 (5th Cir. 1964); Talbot-Windsor Corp. v. Miller, 309 F.2d 68 (1st Cir. 1962).

For error in directing a verdict, the judgment of the District Court is reversed and the cause is remanded for a new trial.