616 F.2d 924
 Joan WOODRUFF; Patricia Woodruff Hamilton and Louis
Hamilton, her husband, Plaintiffs-Appellants,
v.
Hewitt P. TOMLIN, Jr.; Homer H. Waldrop; Roy Hall; and David
R. Farmer, Individually and as Partners doing business under
the name and style of Waldrop, Hall, Tomlin & Farmer, a
Professional Business Association, Defendants-Appellees.
 No. 77-1216.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 4, 1979.
Decided Feb. 21, 1980.
 
 Norman Herring, Robert Stephan, Jr., Phoenix, Ariz., James F. Schaeffer, Memphis, Tenn., for plaintiffs-appellants.
 Leo E. Bearman, Jr., John Thomason, Memphis, Tenn., for defendants-appellees.
 Wilson Sims, Nashville, Tenn., Jac Chambliss, Chattanooga, Tenn., for amicus Tennessee Bar Association.
 Thomas R. Prewitt, Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., for amicus Memphis & Shelby County Bar Association, Inc.
 Before EDWARDS, Chief Judge, and WEICK, CELEBREZZE, LIVELY, ENGEL, KEITH and MERRITT, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 This case involves a claim of legal malpractice arising from the manner in which the defendants handled litigation on behalf of the plaintiffs in the Tennessee state courts. Jurisdiction of the district court was based on diversity of citizenship. The district court severed the plaintiffs' claims based on alleged conflict of interests in the defendants' representation of multiple parties. The district court also ordered a bifurcated jury trial, reserving questions of damages until after the jury had determined issues of liability. The case was tried to a jury on the plaintiffs' claims that the defendants negligently conducted "the investigation, preparation for trial and presentation at trial" of the plaintiffs' claims for personal injuries arising from an auto-truck collision. The jury in the district court was unable to agree on a verdict and the court declared a mistrial. The defendants then filed a motion for judgment n. o. v. and for dismissal of the complaint. This motion was granted. Woodruff v. Tomlin, 423 F.Supp. 1284 (W.D.Tenn.1976).
 
 
 2
 An appeal was taken to this court from the final judgment dismissing the malpractice action. After oral argument a panel of the court reversed the judgment of the district court. Woodruff v. Tomlin, 593 F.2d 33 (6th Cir. 1979). Thereafter this court granted rehearing en banc by an unpublished order entered May 24, 1979. Following additional briefing and oral argument the case is before the court for decision. Though the effect of the granting of a rehearing en banc is to vacate the previous opinion and judgment of this court (Rule 14, Rules of the Sixth Circuit), we adopt the following statement from the panel opinion:
 
 
 3
 The plaintiffs, Joan Woodruff and her sister Patricia, then 15 and 16 years of age respectively, were severely injured on May 22, 1968, when an automobile driven by Patricia and owned by her father, in which automobile Joan was riding as a passenger, was struck by a large truck loaded with gravel weighing about 73,000 pounds, on Highway 100 in Chester County, Tennessee. Joan was thrown out of the car and the truck ran over her legs, crushing the bones and tearing the skin off her legs, crippling her for life. Patricia sustained a skull and brain injury resulting in traumatic amnesia, so that she had no memory of the accident.
 
 
 4
 The girls' hospital bills alone exceeded $20,000.
 
 
 5
 The girls' father, Charles Woodruff, carried liability insurance on his car with Tennessee Farmers Mutual Insurance Company, with limits of $10,000 for one person, and $20,000 for more than one person. While the girls were in the hospital Theo. Leathers, the Claims Adjuster for the insurer, contacted Mr. Woodruff and gave him a check for medical reimbursement. Leathers advised Mr. Woodruff that he should retain a lawyer. Leathers told Mr. Woodruff that the statements of witnesses to the collision were inconsistent and were changing.
 
 
 6
 Leathers recommended to Woodruff that he retain Hewitt P. Tomlin, stating that Tomlin was a good lawyer. Tomlin was also the attorney for Tennessee Farmers Mutual Insurance Company. Woodruff then engaged Tomlin to represent his two daughters, and also to represent himself in his claim for damages to his car.
 
 
 7
 Tomlin filed two suits for personal injuries sustained by the girls and one for damages to the car, against Pomeroy, the driver of the large truck, Teague, the owner of the truck, and Nobles, the owner of the second truck. The suits were filed in the Circuit Court of Chester County, Tennessee.
 
 
 8
 Pomeroy, the truck driver, and Teague, the owner of the truck, filed suits in said Circuit Court against Patricia Woodruff and her sister Joan, to recover damages for personal injury sustained by Pomeroy, and for damages to the truck. They alleged negligence on the part of Patricia, and that Joan, the passenger, aided and abetted. Tomlin, as attorney for Tennessee Farmers Mutual Insurance Company, defended the suits against the two girls. The suits were all consolidated for trial.
 
 
 9
 The cases in the state court were tried before a jury, which disagreed 9-3, and a mistrial was declared. At the second trial in the state court the jury returned a verdict in favor of the defendants in the personal injury actions of Patricia and Joan against Pomeroy, Teague and Nobles. In the suit of Pomeroy and Teague against Patricia and Joan the jury returned verdicts in favor of Pomeroy for $600, and Teague in the amount of $3,000.
 
 
 10
 Upon appeal to the state court of appeals the judgments for the defendants in the personal injury cases of Patricia and Joan against Pomeroy, Teague and Nobles, were affirmed. The judgments in favor of Pomeroy and Teague against Patricia, totaling $3,600, were affirmed, but were reversed as to Joan, the Court holding that there was no evidence to prove that Joan, the passenger, aided and abetted in the negligence of Patricia. Therefore Joan was not contributorily negligent, and Patricia's negligence could not be imputed to her.
 
 
 11
 593 F.2d at 35-36.
 
 
 12
 In the district court the plaintiffs contended that the loss of their personal injury actions in the state trial and appellate courts was proximately caused by negligence of the defendants and by their breach of fiduciary duties arising from the attorney-client relationship. The claim of negligence was predicated upon the following acts and omissions of the defendant Tomlin or other members of his law firm:
 
 
 13
 (1) Failure to attempt to obtain a change of venue or take a nonsuit and refile in a federal court after the first personal injury trial resulted in a hung jury.
 
 
 14
 (2) Failure to object to a "clearly erroneous" jury instruction at the second personal injury trial and failure to include the giving of this instruction in the motion and grounds for a new trial.
 
 
 15
 (3) Failure to consult a traffic reconstruction expert to develop time/distance factors and establish stopping distances.
 
 
 16
 (4) Failure to interview and present available witnesses who could testify to important facts.
 
 
 17
 (5) Failure to bring to attention of the trial court certain Tennessee statutes bearing on issues in the case.
 
 
 18
 (6) Negligence in the conduct of the appeal. This claim was based primarily on the fact that the defendants conceded in their brief in the Tennessee Court of Appeals that there was substantial evidence to support the jury's finding that Patricia was negligent in the operation of her father's automobile. It was also contended that the defendants failed to argue applicable statutes in their appellate brief and failed to argue the "clearly erroneous" instruction.
 
 
 19
 All of these contentions have been renewed in this court. Since this is a diversity case the court is required to apply the substantive law of Tennessee. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Our problem in this respect arises from the fact that the Supreme Court of Tennessee has never decided a legal malpractice case on facts even remotely resembling those of the present case. In fact, there is a dearth of reported decisions from any jurisdiction dealing with charges of negligence and malpractice in the conduct of litigation. However, the Tennessee Court of Appeals rendered a decision while the present case was pending in the district court in which it held "there can be no cause of action against an attorney arising out of the manner in which he honestly chooses to present his client's case to the trier of facts." Stricklan v. Koella, 546 S.W.2d 810, 814 (Tenn.App.1976), cert. denied by Supreme Court of Tennessee, February 7, 1977. The district court found that the Stricklan case "deals squarely with the question presented here." 423 F.Supp. at 1288. On appeal it is argued by the defendants that Stricklan states the common law of Tennessee, and since there was no charge of dishonesty or bad faith on their part, there can be no cause of action against them for the manner in which they chose to conduct the litigation on behalf of the plaintiffs.
 
 
 20
 In an early decision applying the Erie doctrine, the Supreme Court held that "in the absence of more convincing evidence of what the state law is," a federal court should apply the law as declared by an intermediate state court. Fidelity Trust Co. v. Field, 311 U.S. 169, 177-78, 61 S.Ct. 176, 178, 85 L.Ed. 109 (1940). Chief Justice Hughes, writing for the Court, noted, "(W)e have no other evidence of the state law in this relation." Id. at 178, 61 S.Ct. at 178. At the same term the Supreme Court further defined the rule to be applied by federal courts as follows:
 
 
 21
 A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court, even though it thinks the rule is unsound in principle or that another is preferable. State law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of "general law" and however much the state rule may have departed from prior decisions of the federal courts.
 
 
 22
 Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.
 
 
 23
 West v. American Telephone & Telegraph Co., 311 U.S. 223, 236-37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940) (citation omitted).
 
 
 24
 See also, Six Companies v. Highway District, 311 U.S. 180, 188, 61 S.Ct. 186, 188, 85 L.Ed. 114 (1940). Thus, before concluding that Stricklan v. Koella states the rule of law of Tennessee we must determine whether there is "more convincing evidence of what the state law is" with respect to legal malpractice in the conduct of litigation.
 
 
 25
 Tennessee clearly recognizes a cause of action for legal malpractice. In fact, the concluding paragraph of the opinion in Stricklan v. Koella states, "We do not hold that there generally is no cause of action against an attorney for his negligence or malpractice . . . ." 546 S.W.2d at 814. The Supreme Court of Tennessee stated the rule as follows in In Re Woods, 158 Tenn. 383, 13 S.W.2d 800 (1929):
 
 
 26
 While an attorney does not guarantee the accuracy of all he does, he is bound to exercise reasonable skill and diligence in attending to business intrusted to his care, and he is bound to possess such reasonable knowledge of well-settled rules of law as will enable him to perform the duties he undertakes. Bills v. Polk, 72 Tenn. (4 Lea) 494; Bruce v. Baxter, 75 Tenn. (7 Lea) 477; Read v. Patterson, 79 Tenn. (11 Lea) 430; Collier v. Pulliam, 81 Tenn. (13 Lea) 114; Hill v. Mynatt (Tenn.Ch.App.) 59 S.W. 163, 52 L.R.A. 883.
 
 
 27
 "For loss to clients resulting from a want of proper knowledge of matters of law in common use, or of such plain and obvious principles as every lawyer is presumed to know, an attorney is liable, and he is usually held to be liable for the consequences of his ignorance or nonobservance of the rules of the courts in which he practices, or for his ignorance of the statutes and published decisions of his own state." 2 R.C.L. 1015.
 
 
 28
 158 Tenn. at 389-90, 13 S.W.2d at 803.
 
 
 29
 The cases cited by the Tennessee Court in In Re Woods, supra, and other cases here cited disclose a longstanding recognition of the general rule recognizing a cause of action for legal malpractice. However, none of these cases involved the actual conduct of litigation. See, e. g., Jones v. Williamson, 45 Tenn. (5 Cold.) 371 (1868) (liability for confessing judgment without authority); Maxwell v. Owen, 47 Tenn. (7 Cold.) 630 (1868) (liability for assigning a debt without permission); Bruce v. Baxter, 75 Tenn. (7 Lea.) 477 (1881) (liability for lack of diligence in collecting claims); Collier v. Pulliam, 81 Tenn. (13 Lea.) 114 (1884) (liability for failure to bring suit upon an account). In Hillhouse v. McDowell, 219 Tenn. 362, 410 S.W.2d 162 (1966), the Supreme Court of Tennessee reversed a circuit court judgment for an attorney in a malpractice action. The legal malpractice claim was founded on the attorney's failure to prosecute his client's personal injury action within the time prescribed by the applicable Tennessee statute of limitations. Though the court based its reversal on a finding that the trial court had applied the wrong statute of limitations to the legal malpractice action, it made several noteworthy comments on the nature of an attorney's duty to a client. For example, the court quoted from its earlier opinion in Bruce v. Baxter, supra, as follows:
 
 
 30
 * * * When a person adopts the profession of the law, and assumes to exercise its duties in behalf of another for hire and reward, he must be held to employ in his undertaking a reasonable degree of care and skill; and if any injury result to the client from want of such reasonable care and skill, the attorney must respond to the extent of the injury sustained.
 
 
 31
 410 S.W.2d at 164.
 
 
 32
 Further, the court described the action before it in this language:
 
 
 33
 We feel that this suit is based upon an attorney-client relationship of trust, and in addition to being an implied contract it was an express contract that he would exercise reasonable skill and diligence in doing what was undertaken and that when there was a failure to thus exercise such diligence this was a breach of contract rendering the attorney liable for the loss resulting, but no more.
 
 
 34
 410 S.W.2d at 166.
 
 
 35
 It appears that the Supreme Court of Tennessee has not held that an attorney may never be liable for negligence in the conduct of litigation. In view of the inclusive language which that court has used in describing the duty of attorneys to exercise reasonable care and skill in their undertakings for clients we conclude that the district court read Stricklan too expansively. The Tennessee Court of Appeals in Stricklan described the case thus:
 
 
 36
 Essentially and in simple terms, the cause of action stated is that retained counsel refused to use the trial tactics insisted upon by the client, for which refusal retained counsel's services were terminated . . . .
 
 
 37
 546 S.W.2d at 812.
 
 
 38
 After noting cases where the Tennessee courts had recognized a cause of action for legal malpractice, the court of appeals stated, "However, none of the Tennessee cases that we find recognize a cause of action for alleged negligence in the attorney's choice of trial tactics or conduct of the cause." Id. at 813.
 
 
 39
 When viewed in light of the general Tennessee rule which holds attorneys liable for losses to clients for failure to exercise reasonable skill and care, Stricklan can only mean that there can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule.[1] Otherwise, every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. If this were permitted, as Judge Brown pointed out in the present case, the original trial would become a "play within a play" at the malpractice trial. To hold that an attorney may not be held liable for the choice of trial tactics and the conduct of a case based on professional judgment is not to say, however, that an attorney may not be held liable for any of his actions in relation to a trial. He is still bound to exercise a reasonable degree of skill and care in all his professional undertakings.
 
 
 40
 Leaving aside for later treatment the allegations of conflict of interests, we will examine the plaintiffs' claims of negligence in the investigation, preparation for trial and presentation at trial of their personal injury actions.
 
 
 41
 (1) FAILURE TO ATTEMPT TO OBTAIN A CHANGE OF VENUE OR TAKE A NONSUIT AND REFILE IN FEDERAL COURT. This claim is based on testimony of Charles Woodruff, father of the plaintiffs herein, that he was told that he and his daughters could not get a fair trial in Chester County, Tennessee. Mr. Woodruff testified that he related this information to the defendant Tomlin and that Tomlin advised him that the case had to be tried in Chester County. The chances of getting a change of venue to another Tennessee circuit court on the basis of this unsubstantiated rumor would be virtually non-existent. An attorney should not be charged with malpractice for refusing to make such a frivolous motion.
 
 
 42
 The plaintiffs claim, however, that they had moved to Arizona in November 1969 and that Tomlin could have brought the action in a federal court in Tennessee after that time, invoking diversity jurisdiction. It is not at all clear that Tomlin was advised that the Woodruff family had changed its residence to Arizona. In fact, at the second trial in 1971, Joan Woodruff was asked, "Where do you presently live?" Her response was, "Toone I live in Piney Grove, but on Toone Route." Though the family had lived for two years in Arizona, this reply by a plaintiff who was then 18 years old, indicated her residence was the same as it had been on the date of the accident. Though Mr. Tomlin conceded in his deposition that if the Woodruffs had actually changed their residence to Arizona an action could have been filed in federal court, he further stated that he regarded the Woodruff family as Tennessee residents. Further, Tomlin testified without contradiction that there was no perceptible pattern of higher verdicts for plaintiffs in the federal courts of West Tennessee than in the local courts of the region.
 
 
 43
 We conclude that there is no basis in this record for holding that Tomlin's continued pursuit of the plaintiffs' actions in the circuit court of Chester County, Tennessee could be found negligent, or otherwise constitute malpractice. This claim was properly dismissed by the district court.
 
 
 44
 (2) FAILURE TO OBJECT TO A "CLEARLY ERRONEOUS" JURY INSTRUCTION AND TO PRESERVE THIS ERROR FOR APPEAL. This claim refers to the last clear chance instruction which was given at the second personal injury trial:
 
 
 45
 I charge you that if you believe from the evidence that Mr. Pomeroy saw, or by the exercise of reasonable care, should have seen the plaintiffs' vehicle in a position of imminent peril and in danger of being struck by the truck which he was driving, and you find that the defendant, Pomeroy, in time thereafter by the exercise of reasonable care with the means and appliances at hand on his truck, and with safety to himself and to his truck, could have stopped the same or could have decreased the speed of same, or could have diverted the course of same, and thereby avoided the collision, the plaintiffs would be entitled to recover, provided they are not guilty of contributory negligence that proximately caused the accident.
 
 
 46
 On its face this instruction does appear erroneous, since the doctrine of "last clear chance" only applies to a plaintiff who is negligent, and the final clause of the instruction appears to nullify what went before. Nevertheless, this instruction reflected the Tennessee rule then being followed that a plaintiff may not rely on last clear chance where his own negligence "continues and is concurrent with the negligence of the defendant as a causal factor up to the time of the event which causes harm." Gardner's Masonry Contractors, Inc. v. St. Louis-San Francisco R. Co., 470 S.W.2d 945, 948-49 (Tenn.App.), cert. denied (1971). Gardner's Masonry was decided by the Western Section of the Court of Appeals of Tennessee three months before the second personal injury trial of the Woodruffs. This was the court to which an appeal would be taken from judgments of the circuit court of Chester County. Some six months after the Woodruff trial the same appellate court concluded that there was a difference between "last clear chance" and "discovered peril" and that continuing contributory negligence is a complete defense to a claim based on last clear chance, but has no effect on discovered peril. See Smith v. Craig, 484 S.W.2d 549, 552 (Tenn.App.), cert. denied (1972).
 
 
 47
 In Street v. Calvert, 541 S.W.2d 576 (Tenn.1976), the Supreme Court of Tennessee held that the interpretation of last clear chance, discovered peril and "discoverable peril" by the appellate court in Gardner's Masonry and Smith v. Craig, was erroneous. However, in doing so the court acknowledged that three of its earlier decisions (Williford, Roe and Todd ) "provided some support" for the holdings of Gardner's Masonry and Smith v. Craig. Id. at 583. The decision in Street v. Calvert was rendered nearly five years after the second Woodruff trial.
 
 
 48
 In view of the confusion surrounding the proper application of last clear chance in Tennessee at the time of the Woodruff trial we can find no basis for holding that attorney Tomlin could be found negligent for failing to object to the instruction or for failing to urge it as error on appeal to the Western Section of the Court of Appeals of Tennessee. In In Re Woods, supra, the Supreme Court of Tennessee cited with approval the decision of the Tennessee Court of Chancery Appeals in Hill v. Mynatt, 59 S.W. 163 (Tenn.Ch.App.1900). Woods, supra, 13 S.W.2d at 803. In Hill v. Mynatt, the court discussed the responsibility of an attorney in the following language:
 
 
 49
 As a matter of fact, law is not an exact science, and, as said in a leading case, "there is no attainable degree of skill or expense at which all differences of opinion or doubts in respect to questions of law are removed from the minds of lawyers and judges." (Citizens Loan Fund & Savings) Association v. Friedley, 123 Ind. 143, 23 N.E. 1075, 7 L.R.A. 669, 18 Am.St.Rep. 320. And if all of us had to go out for mistakes of judgment upon points of new occurrence, or of nice or doubtful construction, it is apprehended that the ranks of the profession, and of judges not final in their jurisdiction, would be decimated at an appalling rate. We recognize and approve the rule attaching liability to the attorney whose client suffers loss on account of his failure to understand and apply well-established principles of law, settled by text-books and cases published long enough for him, exercising reasonable diligence, to have informed himself of them. In other words, an attorney has no right to be a clam, and shut himself up in the seclusion of his own self-conceived knowledge of the law. He must keep pace, so far as reasonable diligence and a fair amount of common sense will enable him to do so, with the literature of his profession, and what the courts have decided. But the law does not require and never has required of a member of the profession that he should be a true Sir Oracle of what the courts have decided or will decide as the law applicable to every given state of facts.
 
 
 50
 59 S.W. at 167.
 
 
 51
 This claim was properly dismissed by the district court.
 
 
 52
 (3) FAILURE TO CONSULT A TRAFFIC RECONSTRUCTION EXPERT. Tomlin did employ an engineer who made measurements at the scene of the accident and prepared a plat. There was no evidence that the accepted standard of performance for Tennessee lawyers requires consultation with a traffic reconstruction expert, or use of such a witness, in highway accident cases. The decision to establish the physical facts of the case by use of an engineer's plat rather than the testimony of an expert appears to be one of trial tactics or judgment as to the most effective presentation of a client's case. Once the distances between objects were established the time/distance factors and stopping distances were simple mathematical computations. In the absence of bad faith, the failure to consult an expert cannot be the basis of liability. Stricklan v. Koella, supra. There was no claim of bad faith in this case.
 
 
 53
 The plaintiffs also complain that Tomlin did not interview or attempt to weaken by cross-examination the testimony of an expert witness who estimated the speed of the Woodruff vehicle, based on the length of skid marks, at 76 m.p.h. Tomlin explained that the witness was a colonel in the State Police Force of Tennessee, whom he knew well, and that he did not believe he could shake his testimony. Instead, Tomlin decided to rely on the testimony of the passenger-plaintiff Joan Woodruff and the driver of the car following closely behind the Woodruff vehicle, Gayle Sterling. Both these witnesses testified positively that Patricia Woodruff was driving at no more than 55 m.p.h. on a road with a 65 m.p.h. speed limit. This was clearly a tactical decision by Tomlin which would furnish no basis for a malpractice claim under Stricklan. This claim was properly dismissed by the district court.
 
 
 54
 (4) CONCESSIONS IN THE APPELLATE BRIEF. In their brief in the court of appeals the law firm representing the Woodruffs (the brief was written by defendant Waldrop) conceded that there was substantial evidence to support the jury's finding that Patricia Woodruff was negligent in the operation of her father's car. This was clearly so. If the jury believed the expert who testified for the defendants or the defendant Pomeroy it could find that Patricia Woodruff was operating her vehicle at an excessive rate of speed. The brief did not concede that Pomeroy, the driver of the truck which collided with the Woodruff car, was free of negligence. Nor did it concede that Lewis Nobles, the driver of a third vehicle on the highway, was free of negligence.
 
 
 55
 Tomlin explained the concessions in his testimony. He pointed out the duty of an attorney to be honest with the court. He and his associates felt that there was no basis for reversing the jury's finding of negligence by Patricia Woodruff under Tennessee law. However, since Patricia's negligence was not imputed to Joan, the passenger, it was decided to concentrate on attempting to salvage Joan Woodruff's case on appeal. This consisted of attempting to show that the defendant Nobles was negligent as a matter of law and that Pomeroy was negligent in not beginning to brake his heavy truck until he was virtually upon the stopped Woodruff vehicle. There was support in the record for both of these arguments. Nobles had admitted that he was stopped ahead of the Woodruff car and in its lane of travel and had just started slowly forward before the accident. This was corroborated by Pomeroy who testified he was unable to pull into the left lane to avoid the Woodruff car after it skidded into his driving lane because of the presence of the Nobles vehicle in the left lane. As to Pomeroy's negligence, the testimony of several witnesses placed him at a point when the Woodruff car began skidding which would have permitted him to stop before reaching the point of collision. Yet, marks in the road indicated that he applied his brakes for the first time immediately prior to the collision.
 
 
 56
 The decision to concentrate on Joan's case on appeal clearly appears to have been based on professional judgment. By the time of the appeal it was known that Joan Woodruff's injuries were more serious than those of Patricia. By conceding that the jury verdict against Patricia was supported by the evidence, the defendants did not concede anything which would have prevented a new trial for Joan if the court of appeals had "bought" their arguments with respect to the negligence of Nobles and Pomeroy. In fact, the court of appeals did vacate the judgments of Pomeroy and Teague against Joan. It chose to abide by the jury's verdict with respect to Joan's claim against the same two defendants. We conclude that the concessions in the appellate brief resulted from a tactical decision reached in the exercise of professional judgment and do not furnish a basis for a malpractice action. Stricklan v. Koella, supra. This claim was properly dismissed by the district court.
 
 
 57
 (5) FAILURE TO INTERVIEW AND PRESENT AVAILABLE WITNESSES WHO COULD TESTIFY TO IMPORTANT FACTS. Charles Woodruff testified that he told Tomlin, well before trial, that Eugene Burkhead might make a valuable witness. Burkhead was in the woods some distance from the highway. He was conversing with Lewis Nobles who had a loudspeaker in his car and had called to him. Supposedly Burkhead would have testified that there was a lapse of five to six seconds after the tires of the Woodruff car quit screeching before the crash when the Pomeroy-Teague truck hit it. Such testimony would have tended to support the theory that the Woodruff car had completely stopped in a position of peril with time enough for Pomeroy to have avoided the collision. Tomlin testified he had concluded that since Burkhead was not at the accident scene he possessed no knowledge material to the lawsuit. Tomlin further testified that he had no recollection of ever talking with Burkhead and that he had no written statement from him. There was a statement taken by an insurance adjuster on June 5, 1968 in which Burkhead made no estimate of the lapse of time between the end of the skid and the impact.
 
 
 58
 Charles Woodruff also testified that he told Tomlin that a family friend, a mail carrier named Mclendon, had gone to the scene shortly after the accident and stepped off the Woodruff skid marks. Charles Woodruff's son was with Mclendon, and Tomlin was told that both men would testify that the skid marks were 60 paces long, approximately 180 feet. Charles Woodruff testified that he told Tomlin of this evidence during the first trial when an investigating officer testified that the skid marks were 252 feet long. Woodruff said he reminded Tomlin of the existence of this evidence before the second trial. Mrs. Woodruff supported her husband's testimony. Tomlin testified that he never heard of the Woodruffs' son or Mclendon until the malpractice action was filed.
 
 
 59
 Our review of a judgment n. o. v. is governed by the same rule which applies to an appeal from a directed verdict granted at the close of all the evidence. We are required "to view the evidence, as well as all inferences properly deducible therefrom, in the light most favorable to the plaintiff." Campbell v. Oliva, 424 F.2d 1244, 1245 (6th Cir. 1970). A judgment n. o. v. should not be granted "unless the evidence is such that there can be but one reasonable conclusion as to the proper verdict." Reeves v. Power Tools, Inc., 474 F.2d 375, 380 (6th Cir. 1973). While the determination of whether to call a particular person as a witness at trial is a tactical decision involving the exercise of professional judgment, the same cannot be said concerning the failure to interview a potential witness brought to the attention of an attorney by his client. If the persons mentioned by Charles Woodruff were prepared to testify as he believed they would, their evidence would have been material to the issues in the case. Without interviewing them Tomlin had no basis for determining what they would testify to, if called, or for making a judgment as to their effectiveness as witnesses. Failure to follow leads furnished by a client which, if fruitful, would supply significant support for the client's case is not the same as refusing "to use the trial tactics insisted upon by the client . . . ." Stricklan v. Koella, supra, 546 S.W.2d at 812. In Stricklan the attorney took the depositions of witnesses as requested by the client. However, the attorney concluded that the depositions would be of no use in the trial and did not order them transcribed and filed. This was an exercise of professional judgment which is immune from a claim of malpractice. The situation here was different.
 
 
 60
 Viewing the evidence in support of this claim in the light most favorable to the plaintiffs, we conclude that an issue was presented which required a determination by the trier of fact. A jury could have believed that failure even to determine the availability, accuracy, and probable effectiveness of these witnesses constituted a failure "to exercise reasonable skill and diligence in attending to business intrusted in his care, . . . ." In Re Woods, supra, 158 Tenn. at 389, 13 S.W.2d at 803. It was error for the district court to grant judgment n. o. v. as to this claim.
 
 
 61
 (6) FAILURE TO BRING TO THE ATTENTION OF THE TRIAL COURT CERTAIN TENNESSEE STATUTES AS A BASIS FOR HOLDING THE DEFENDANTS LIABLE. Though he requested instructions on several statutes defining duties of operators of vehicles on public highways, Tomlin did not rely on Sections 59-854 and 59-859 of Tennessee Code Annotated. These statutes make it unlawful to drive a vehicle so slowly as to impede traffic or to stop a vehicle within 200 feet of the crest of a hill. There was evidence that the defendant Lewis Nobles, driver of the vehicle which did not collide with either the Woodruff car or the Pomeroy-Teague truck, was stopped in the highway or was proceeding very slowly as the Woodruff car approached him from the rear. If the jury had accepted this evidence, under proper instructions, it would have been required to find Nobles negligent as a matter of law and would have had to decide only questions of proximate cause and contributory negligence. Though the defendants argued in the trial court and on appeal that Nobles was negligent in blocking the highway in front of Patricia Woodruff, thus setting into motion the chain of events which culminated in her car being struck by the Pomeroy-Teague truck, Tomlin gave no explanation in this action for his failure to urge TCA §§ 59-854 and 59-859 as establishing Nobles' negligence. The arguments on behalf of Joan Woodruff on appeal would have been appreciably stronger if Nobles had been shown to be negligent as a matter of law.
 
 
 62
 The Supreme Court of Tennessee further held in In Re Woods, supra,
 
 
 63
 For loss to clients resulting from a want of proper knowledge of matters of law in common use, or of such plain and obvious principles as every lawyer is presumed to know, an attorney is liable, and he is usually held to be liable for the consequences of his ignorance or nonobservance of the rules of courts in which he practices, or for his ignorance of the statutes and published opinions of his own state.
 
 
 64
 158 Tenn. at 390, 13 S.W.2d at 803.
 
 
 65
 We conclude that it was error to grant judgment n. o. v. in favor of the defendants on this claim.
 
 CONFLICT OF INTERESTS
 
 66
 The jury heard no evidence on the charge of malpractice based on alleged conflict of interests. Nevertheless, the district court included this claim in its judgment n. o. v. We believe the true effect of the court's action with respect to this claim was that it granted summary judgment for the defendants. The issue of conflict of interests was thoroughly covered in pretrial depositions and the District Judge heard evidence on the issue outside the presence of the jury. We will treat the action of the court as the entry of summary judgment on this claim of malpractice.
 
 
 67
 The alleged conflict of interests arose from the fact that Tomlin undertook to represent Tennessee Farmers Mutual Insurance Company, Charles Woodruff, Patricia Woodruff and Joan Woodruff. The interests of the insurance company, the insured father and Patricia, who was driving with her father's permission, appear to have been identical. The legal rights and obligations of all three, insofar as the consolidated actions were concerned, were the same. Thus this claim is centered on the continued representation of the passenger, Joan Woodruff. As a passenger, Joan had a potential claim against her sister Patricia, which it would have been the duty of the insurance company to defend. Though there is a dispute as to whether the policy contained a family exclusion which would have prevented Joan from recovering damages, the policy was never filed in the record. The district court assumed there would have been coverage. 423 F.Supp. at 1289. The question is what duty was imposed upon the attorney in this situation.
 
 
 68
 The plaintiffs argue that it was malpractice for Tomlin to continue to represent Joan and that he had an absolute duty to withdraw as her counsel if he continued to represent her sister, her father and his insurer. The plaintiffs' expert, an Arizona attorney, testified to this effect and gave several examples of how the multiple representation would be damaging. So far as this record reveals, Tennessee has no rule which absolutely forbids multiple representation. However, the attorney-client relationship requires an attorney to be alert to potential conflicts and to decline multiple representation when actual conflicts develop. The Tennessee Supreme Court has adopted the Code of Professional Responsibility. Disciplinary Rule 5-105(C), a part of the Code, provides in cases where multiple representation is likely to involve him in representing differing interests, "a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." 5A Tenn.Code Ann. p. 119 (1978) (emphasis supplied).
 
 
 69
 We recognize that the Code of Professional Responsibility "does not undertake to define standards for civil liability of lawyers for professional conduct." 5A Tenn.Code Ann. p. 89 (1978). Nevertheless, it certainly constitutes some evidence of the standards required of attorneys. See Annot., Malpractice: Liability of Attorney Representing Conflicting Interests, 28 A.L.R.3d 389 (1969); Crest Investment Trust, Inc. v. Comstock, 23 Md.App. 280, 327 A.2d 891, 904 (1974); Lysick v. Walcom, 258 Cal.App.2d 136, 65 Cal.Rptr. 406, 414 (1968).
 
 
 70
 It is clear that the defendant Tomlin never advised Charles Woodruff that Joan had a potential claim against Patricia. It appears that Tomlin had no knowledge of a family exclusion which would have prevented Joan from recovering damages under her father's policy, if such exclusion existed. Tomlin testified that both Mr. and Mrs. Woodruff were firm that Patricia was free of any negligence and wanted to protect her from any inference of responsibility. Further, Patricia had no memory of the events surrounding the collision and Joan consistently stated that it was not Patricia's fault. On the other hand, Charles Woodruff testified that he would have permitted Joan to sue Patricia and that he did not know of this possibility until after the trials were over.
 
 
 71
 Though it appears unlikely that Charles Woodruff would have sought other counsel for Joan if he had known of her potential claim against Patricia, this did not relieve the attorney of his obligation to disclose the differing interests and potential conflict. Woodruff's testimony, which must be taken as true for purpose of this appeal, at least created an issue of fact on the question of conflict of interests. The district court does not appear to have held that there was no conflict in the multiple representation. Rather, it dismissed this claim on a finding that it would be speculation for a jury to find that Tomlin's multiple representation affected the outcome of the trial. 423 F.Supp. at 1289. We think the harm to Joan may be more than a different outcome of the trial of the action against Pomeroy, Teague and Nobles. She may have lost the opportunity for a recovery based on the negligence of Patricia, remote as that possibility may appear.
 
 
 72
 The speculative nature of the damages disturbed the district court throughout the proceedings in this malpractice action. This is understandable, given the Tennessee rule that a client may only recover from an attorney for malpractice if he shows that "but for" the malpractice he would have been successful in the case in question. A plaintiff's burden was stated as follows in Gay & Taylor, Inc. v. American Casualty Co., 53 Tenn.App. 120, 381 S.W.2d 304, 306 (1963), cert. denied (1964):
 
 
 73
 The burden of proving that damages resulted from the negligence of an attorney, or from his failure to follow instructions, in connection with the prosecution or defense of a suit rests upon the client and usually requires the client to demonstrate that, but for the negligence complained of, the client would have been successful in the prosecution or defense of the action in question. 7 Am.Jur., Attorneys at Law, Sec. 188, p. 156; Anno. 45 A.L.R.2d 21.
 
 
 74
 Nevertheless, causation is a jury question. Loftis v. Finch, 491 S.W.2d 370, 373 (Tenn.App.1972), cert. denied (1973). The jury could determine, on the basis of expert testimony, whether Joan suffered any injury in fact as the result of Tomlin's failure to advise her father of the potential conflict of interests inherent in his representation of all three plaintiffs and the insurance carrier. A trial of this issue would produce evidence of the actual coverage of the policy (whether there was an exclusion as to Joan) and expert opinion as to whether Joan's case against Pomeroy and Nobles would have been strengthened if she had been independently represented. Such evidence will involve "second guessing." Nevertheless, if the concept of legal malpractice, recognized by the Tennessee courts, is to be more than a mirage, plaintiffs who can produce evidence of negligence or breach of fiduciary responsibility by their attorneys must be given the opportunity to show that they have been damaged. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). We do not believe that either the holding in Stricklan v. Koella or the tenuous nature of the connection between the attorney's acts or omission and financial injury creates an immunity from liability.
 
 
 75
 Some comment is required on Judge Merritt's dissent. His broadside attack on the court's opinion misstates our holding in several respects.
 
 
 76
 (1) The court does not hold that T.C.A. §§ 59-854 and 59-859 would clearly apply to the facts of the Woodruff case. What we do hold is that these statutes should have been argued as one basis of the Woodruff claims. The dissent concludes neither would have applied. We merely say that they dealt with highway conduct remarkably like that of Lewis Nobles, and the Woodruffs are entitled to have a jury determine whether Tomlin should have used the statutes as the basis of a specific request to charge the jury and a specific claim of error on appeal. Tomlin never mentioned either statute beyond a reference to § 859 in the original complaint.
 
 
 77
 (2) The court does not hold that Tomlin was required to call Burkhead and Mclendon as witnesses. If he had made an informed decision not to call them, that would clearly have been a tactical decision not subject to question in the malpractice action. However, when an attorney fails even to interview persons whom his client has named to him as potential witnesses in support of his case, the attorney has not exercised professional judgment. He has merely neglected his client's cause. The record does not support the dissent's conclusion that Tomlin made a tactical decision or exercised his judgment with respect to either potential witness. Mr. Woodruff testified positively that Tomlin was told of Eddie Woodruff and James Mclendon both during the first trial and before the second trial. Mrs. Woodruff corroborated this testimony. On a motion for judgment notwithstanding verdict the trial court was required to resolve discrepancies in the evidence in favor of the Woodruffs.
 
 
 78
 (3) The court does not hold that Joan should have been persuaded to change her story to make out a claim against Patricia. The evidence of breach of duty consisted of Tomlin's failure to advise Joan and her father of the possible existence of a cause of action by Joan against Patricia. All this court holds on the conflict of interests issue is that the plaintiffs were entitled to have a jury determine whether Tomlin's failure to advise his clients fully, in the light of his multiple representation, was legal malpractice.
 
 
 79
 The dissent implies that the majority is encouraging unethical conduct by suggesting that another lawyer might persuade Joan to change her "consistent claim that her sister was not at fault." Of course, the majority makes no such suggestion. Another attorney, without attachments to Patricia's insurance carrier, might have concluded from Joan's testimony that Patricia was, in fact, at fault. What was important was not whether Joan thought Patricia was at fault, but whether the facts testified to by Joan would indicate legal liability on the part of Patricia. Interestingly, in its restatement of the facts, the dissent says that Joan's testimony demonstrated that "Patsy Woodruff panicked, slammed on the brakes and lost control of her car." A completely neutral lawyer hearing such testimony might conclude that Joan, as a passenger, had a claim against the driver.
 
 
 80
 Finally, the dissent completely ignores the fact that we are reviewing a judgment notwithstanding verdict. The decision of this court is not that Tomlin was guilty of malpractice or breach of duty, but that the Woodruffs produced sufficient evidence to have their claims submitted to a jury.
 
 
 81
 The judgment of the district court is affirmed in part and reversed in part. The cause is remanded for a new trial on the issues of failure to contact potential witnesses identified by Charles Woodruff and failure to rely on the statutes previously referred to, and trial on the issue of conflict of interests. All issues are to be tried together. We express no opinion on the outcome of the trial, but hold that the defendants were not entitled to judgment n. o. v. or summary judgment on these issues.
 
 
 82
 Costs on appeal are taxed against the defendants-appellees.
 
 
 83
 WEICK, Circuit Judge, concurring and dissenting in part.
 
 
 84
 I concur in the reversal of the judgment of the district court and in the remand for a new trial because of errors of the district court in the exclusion of evidence and in granting judgment for defendants n. o. v.
 
 
 85
 In my opinion, it is not the law of Tennessee as asserted by Tomlin's counsel, that an attorney who is honest and acts in good faith is exempt from liability to his client in a legal malpractice action for damages sustained by the client as a result of the conflicts of interest, negligent or improper conduct of the attorney in the investigation, trial, and appeal of his client's case.
 
 
 86
 I do not understand that the amicus briefs filed by the bar associations have endorsed any such proposition.
 
 
 87
 It is not the function of the federal judiciary in a diversity case to innovate by establishing new and untried principles of state law, which the state courts may later repudiate.
 
 
 88
 If an attorney in Tennessee with a conflict of interest, who is honest and acts in good faith has a privilege exempting him from liability for damages sustained by his client as a result of the attorney's conflict of interest and negligence in handling his client's lawsuit, then a fortiori the same principle of law should apply to a physician who is honest and acts in good faith and negligently performs an operation on his patient which results in injury to or in the death of his patient.
 
 
 89
 We have applied Tennessee law in holding physicians liable in damages to their patients in medical malpractice cases. O'Neill v. Kiledjian, 511 F.2d 511 (6th Cir. 1975); Campbell v. Oliva, 424 F.2d 1244 (6th Cir. 1970). In neither of these two cases did the physician have the audacity to contend that he was honest and had a good faith privilege to be exempt from liability. In malpractice cases there is no reason for ever exempting attorneys from liability without extending the same exemption to physicians.
 
 
 90
 It should not be forgotten that a solemn relationship of trust and confidence exists between an attorney and his client which ought never to be betrayed. The public ought not to be fearful of engaging the services of an attorney who is exempted by law from liability for his misconduct or negligence.
 
 
 91
 Reliance by the district court on Stricklan v. Koella, 546 S.W.2d 810, 814 (Tenn.App.1976) cert. denied by the Supreme Court of Tennessee for such an outrageous proposition was misplaced as we pointed out in the unanimous decision of our panel (Edwards, Chief Judge, Weick and Celebrezze) reported in 593 F.2d 33, 42-44. Even if Koella supported the erroneous decision of the district judge, which it does not, we would not be required to follow it, because it would be contrary to decisions of the Supreme Court of Tennessee and Tennessee appellate decision as we pointed out and is not supported by any American decisions.
 
 
 92
 I agree also with the majority that the district court erred in holding that the harm done to plaintiffs was "sheer speculation" and therefore beyond the province of the jury. There was abundant evidence of negligence, improper practice and of expert testimony on causation. A factual question existed for determination by the jury and not by the district court.
 
 Conflicts of Interest
 
 93
 The record is clear, as we pointed out in our panel decision, that the insurance company was obligated under the provisions of its policy, to defend its insured Woodruff and his two daughters in the suits filed against them in the state court, by Teague for damages to his truck and by Pomeroy for personal injuries alleged to have been sustained by him in the collision as a result of the negligence of Patricia, the driver and Joan, the passenger in the automobile.
 
 
 94
 Woodruff, on the other hand, had a claim for damages to his car against Teague, Pomeroy and Nobles. Woodruff's two daughters Joan, age 15 and Patricia, age 16, had substantial claims against Pomeroy, Teague and Nobles for terrible personal injuries sustained by the two girls as a result of the negligence of the two truck drivers in impeding traffic in both lanes, of the public highway.
 
 
 95
 Leathers, the insurance adjuster, solicited all of these claims for Tomlin. He told Woodruff that he should have an attorney, that the statements of the witnesses were inconsistent and were changing. Undoubtedly the purpose of the solicitation was to help the insurance company in the defense of the suits which Pomeroy and Teague were about to bring against the two girls for personal injuries sustained by Pomeroy and property damage sustained by Teague. Leathers recommended to Woodruff that he engage Tomlin to represent his two minor daughters, Joan and Patricia.
 
 
 96
 Acting on Leathers' recommendation, Woodruff did consult with Tomlin and retained him to represent his two daughters. Leathers was not bound by any ethical considerations but Tomlin, as an attorney at law, was bound by the Canons of Professional Ethics of the American Bar Association, particularly Canons 6 and EC5-14 and EC5-15 set forth at length in our panel decision (593 F.2d 39, 40) which had been adopted by the Supreme Court of Tennessee in 185 Tenn. 889.
 
 
 97
 As we pointed out in our panel decision, the Canons required Tomlin to disclose to his clients at the time of the retainer "all the circumstances of his relations to the parties and any interest in or connection with the controversy which might influence the client in the selection of counsel.
 
 
 98
 It is unprofessional to represent conflicting interests except by express consent of all concerned given after full disclosure of the facts. Within the meaning of this Canon, a lawyer represents conflicting interests when it is his duty to contend for that which duty to another client requires him to oppose." (Opinions on Professional Ethics, p. 22). See DR5-105, EC5-14, EC5-15, Volume 5A Tennessee Code Annotated Pages 115 and 119, 185 Tenn. 889.
 
 
 99
 Tomlin at the time of his retainer never discussed with his clients any of the circumstances of his relation to the parties and any interest in or connection with the controversy which might influence the clients in the selection of counsel. He never told Joan that she had a claim against her sister Patricia and that the investigation of the insurance adjuster indicated that the statements of witnesses were conflicting. When suits were filed in the state court by Tomlin against Teague, Pomeroy and Nobles in behalf of Joan and Patricia to recover damages for their serious personal injuries and separate suits were filed in the state court by Pomeroy and Teague against the two girls for personal injuries sustained by Pomeroy and damages to Teague's truck allegedly caused by the girls' negligence, Tomlin never advised them that he had a conflict of interest and that Joan should retain separate counsel. The girls and their father were never informed by Tomlin as to their rights and hence could not have given an informed consent to Tomlin's representing them. These suits were all consolidated for trial in the state court.
 
 
 100
 The failure of Tomlin to advise his clients of their rights and his conflict of interest, his failure to advise Joan and her father that Joan should obtain separate counsel, and his failure to withdraw from the case when the conflict became very obvious to him is responsible for most of the damages resulting to Joan, Patricia and her father as a result of Tomlin's misconduct and negligence.
 
 
 101
 The fact that Tomlin was honest and was acting in good faith, as he claims, did not give him a license to violate the ABA Canons of Professional Ethics as adopted by the Supreme Court of Tennessee or authorize him to represent clients when he had conflicts of interest which he never disclosed to his clients.
 
 
 102
 There is Tennessee authority on this subject directly in point. In Holcomb v. Steele, 47 Tenn.App. 704, 342 S.W.2d 236 (1958), cert. denied, by Supreme Court of Tennessee, June 5, 1959, a firm of attorneys undertook to represent both the driver and the passenger of an automobile in an action against the driver of another car for personal injuries arising out of an automobile collision between the two automobiles. The firm of attorneys neglected to advise the passenger of her rights to sue her driver and even recommended that she accept a $400 settlement of her claim against the other driver. The passenger discharged the firm of attorneys she had originally engaged and employed another lawyer who filed suit against both drivers in behalf of the passenger and her husband and recovered a compromise judgment of $3000 against the other driver and $3000 against her driver, and $4000 against both drivers were awarded in favor of the passenger's husband. The firm of attorneys originally employed then intervened in the case asserting that their client had no lawful right to discharge them as attorneys and prayed for a lien on the proceeds of recovery for their 50 percent contractual attorneys fee.
 
 
 103
 The appellate court found that the firm of attorneys were negligent in their handling of the passenger's case by not suing her driver and breached their duty to properly advise their client of her rights against her driver. The court denied attorney's fees to the firm of attorneys.
 
 The Court of Appeals stated:
 
 104
 The negligence of petitioner (the firm of attorneys) and breach of their duty to properly advise and represent Mrs. Holcomb was a breach of their contract of employment and a bar to their right to recover the attorney's fees sued for. P. 244.
 
 
 105
 In New Jersey, the Supreme Court issued a directive:
 
 
 106
 The Supreme Court is of the view, because of the conflict of interest inherent in the situation, that an attorney should not represent both the driver of a car and his passenger in an action against the driver of another car, unless there is a legal bar to the passenger suing his own driver, as, for example, where they are husband and wife, unemancipated child and parent, or employees of the same employer and the accident occurred in the course of their employment. Where an attorney does represent both a driver and his passenger and no such legal bar exists, if a cross-claim or counter-claim is made by the other driver, a conflict of interest arises and the Supreme Court has advised the Assignment Judges that the attorney should not be permitted to continue to represent either the driver or his passenger." 91 N.J.L.J. 68 (Feb. 1, 1968). And see Weinberg v. Underwood, 101 N.J.Super. 448, 244 A.2d 538 at 540 (1968).
 
 
 107
 In the present case, a conflict surely existed because Pomeroy and Teague had cross-claimed against the two girls for damages, for personal injuries and damages to the truck.
 
 
 108
 If Joan had been represented by separate counsel, without any conflict of interest and had included her sister Patricia as a party defendant in her suit in the state court against Teague, Pomeroy and Nobles, the jury could not very well have returned a verdict against Patricia in favor of Teague and Pomeroy based on Patricia's negligence without also returning a verdict in favor of Joan against Patricia. As a matter of fact, it would have changed the complexion of the entire case and could have resulted in a verdict against both truck drivers who were blocking both lanes of the highway.
 
 
 109
 The district judge in a pretrial conference, ruled that in a malpractice action against an attorney, a claim for conflict of interest could not be joined in the malpractice claims of negligence against the attorney in his preparation, conduct of the trial and appeal of the case. The district judge stated:
 
 
 110
 In any case, it appeared that this claim based on the alleged conflict of interest on the part of defendant Tomlin should not be tried with the claims of negligence in losing the lawsuits and therefore it was by pretrial order, not dealt with at the trial.
 
 
 111
 This ruling was clearly erroneous. In the unanimous panel decision we stated:
 
 
 112
 The District Court cites no authority for such a proposition. This was a legal malpractice case. If conflict of interest should not be dealt with in a malpractice case, where should it be dealt with?
 
 
 113
 Malpractice is defined in Webster's New World Dictionary of the American Language, College Edition, with respect to persons other than physicians, as:
 
 
 114
 2. Misconduct or improper practice in any professional or official position.
 
 
 115
 Negligence of an attorney in the investigation, trial, and appeal of his client's case is certainly improper practice in his professional capacity; it is malpractice. It is also malpractice for an attorney to represent parties with conflicting interests, without his disclosing all facts to his clients and obtaining their consent. 593 F.2d 39.
 
 We further stated:
 
 116
 When the District Judge, in a pretrial conference, ruled that conflict of interest could not be considered in a legal malpractice case where negligence was also alleged, the plaintiffs petitioned our Court for a writ of mandamus and prohibition to obtain relief from this error.
 
 
 117
 In an order entered July 8, 1976, we held that no appeal lies from an interlocutory order except by leave of court, and that mandamus is an extraordinary remedy and can not be used as a substitute for an interlocutory appeal. Woodruff v. Honorable Bailey Brown, No. 76-1892, Court of Appeals, 6th Cir.
 
 
 118
 During the trial in the District Court plaintiffs again raised the conflict of interest issue and proffered proof which the District Court rejected, and declined to submit the issue to the jury, and finally dismissed the complaint when it granted judgment n. o. v.
 
 
 119
 In this direct appeal we now have jurisdiction to hear and to determine the issue of conflict of interest.
 
 
 120
 In our opinion it was prejudicial error for the District Court at its pretrial conference to separate and remove the issue of conflict of interest from other issues of malpractice, and to deny the admission of relevant evidence with respect thereto at the trial, and to decline to submit the issue to the jury for determination. If the issue of conflict of interest has been submitted to the jury it could have produced a different result. 593 F.2d 40-41
 
 
 121
 The majority opinion agrees that it was prejudicial error for the district judge to separate from and decline to try the issues of conflict of interest with the other malpractice issues in the case.
 
 
 122
 The Erroneous Instruction On Last Clear Chance
 
 
 123
 The state trial judge in the second trial ruled that there was sufficient evidence of last clear chance to submit that important issue to the jury but unfortunately he gave a clearly erroneous instruction which operated to defeat the plaintiffs' case because he stated that "the plaintiffs would be entitled to recover, provided they are not guilty of contributory negligence that proximately caused the accident."
 
 
 124
 Where the doctrine of last clear chance is applicable the plaintiffs are in a position of peril. There negligence had ceased. The defendants saw the plaintiffs in a position of peril and in the exercise of ordinary care could have avoided the accident but the defendants neglected to exercise such ordinary care. Contributory negligence of the plaintiffs was no longer an issue in the case and the court should have so instructed the jury.
 
 
 125
 Tomlin, as an insurance lawyer engaged in the defense of personal injury cases must certainly be presumed to know the Tennessee law on the issue of last clear chance, yet he made no objection to the erroneous instruction or request to the state trial judge to change the instruction to conform to Tennessee law. Nor did he assign the erroneous instruction on last clear chance as error in the motion for a new trial which he filed.
 
 In our panel decision we stated:
 
 126
 This instruction was clearly erroneous. Under the doctrine of last clear chance plaintiff's contributory negligence had ceased. It was no longer a proximate cause. The defendant saw the plaintiff in a position of peril in sufficient time that he could have averted the collision had he exercised ordinary care.
 
 
 127
 The instruction of the trial court defeated the entire purpose of the doctrine. It conflicted with a decision of the Supreme Court of Tennessee in Vaughn v. City of Alcoa, 194 Tenn. 449, 251 S.W.2d 304 (1952). It also conflicted with our decision applying Tennessee law in Smith v. Beattie, 346 F.2d 139 (6th Cir. 1965).
 
 
 128
 It is argued that the erroneous instruction is supported by an appellate decision in Smith v. Craig, 484 S.W.2d 549 (Ct.App.Tenn., cert. denied August 7, 1972). The Supreme Court of Tennessee repudiated Smith v. Craig, supra, in Street v. Calvert, 541 S.W.2d 576 (Tenn.1976).
 
 
 129
 The trial judge, in giving the erroneous instruction, was bound by the decision of the Supreme Court of Tennessee in Vaughn v. City of Alcoa, supra, rather than by an erroneous decision of an inferior appellate court.
 
 
 130
 Tomlin did not ever object to the erroneous instruction in the state court trial, nor request the court to change it. He did not assert it as error in a motion for a new trial filed in the state court, nor did he assign it as error in the state court of appeals. 593 F.2d 41.
 
 
 131
 Tomlin's partner prepared the appellate brief. The partner did not assign as error the erroneous instruction on last clear chance because Tomlin had not included it in his motion for a new trial. Had it been assigned as error the state court of appeals would have had an opportunity to rule on the issue. If the state appellate court had decided against Tomlin on the issues, Tomlin could have petitioned the Supreme Court of Tennessee for certiorari where the rule announced in Street v. Calvert, 541 S.W.2d 576 (1976) would have controlled and a new trial for both Patricia and Joan would have resulted.
 
 Failure To Call Witnesses
 
 132
 I agree with the majority opinion. I would, however, add to the majority opinion failure of Tomlin to call a reconstruction expert; failure to interview or take the deposition of Col. Dawson, a state police officer who was defendant's expert witness. In my opinion, Tomlin's excuse that it would be unethical is without legal support.
 
 
 133
 In the malpractice trial, Tomlin called as expert witnesses two judges of the state trial courts, one state Court of Appeals judge, and two attorneys to help him out. A state judge had participated in the trials and the appellate judge had written the opinion for the Court of Appeals. Tomlin thus recognized the value of the expert testimony in defending himself and he should have used expert testimony for the benefit of his minor clients in the trials in the state court.
 
 
 134
 It is obvious that the cases of the two girls were very poorly tried by Tomlin in the state court.
 
 Negligence in Conducting Appeal
 
 135
 In addition to Tomlin's failure to appeal the issue the erroneous instruction on last clear chance, Tomlin and his law firm made erroneous and damaging concessions against the interest of their clients which operated to prevent Tomlin from petitioning the Supreme Court of Tennessee for certiorari.
 
 
 136
 These admissions as stated by the Court of Appeals were:
 
 
 137
 In short, the fact is that there is material evidence in this record from which the jury could have concluded that Patricia Woodruff was guilty of negligence. This fact is conceded in appellants' brief and it is therein admitted that neither of the plaintiffs in the original cases of Patricia Woodruff vs. Nobles, Pomeroy and Teague, and in Charles Woodruff vs. the same defendants can now prevail. (App. 162-63)
 
 
 138
 If Tomlin and his law firm had appealed to the state court of appeals the issue concerning the erroneous instruction on last clear chance, a new trial would have been granted either by the state court of appeals or by the Supreme Court of Tennessee to both Patricia and Joan. Street v. Calvert, supra.
 
 
 139
 Furthermore, since it was prejudicial error to eliminate the issue of conflict of interest, the entire case should be remanded for retrial as the majority has held.
 
 
 140
 Failure To Bring To The Attention Of The Trial Court
 
 
 141
 Applicable Tennessee Statutes Relative To Rules Of The Road
 
 
 142
 I agree with the majority opinion on this issue.
 
 
 143
 Failure To Attempt To Obtain Change Of Venue
 
 
 144
 I disagree with the majority opinion on this issue. After the first trial in the state court resulted in a mistrial due to a "hung" jury, one of the jurors advised Mr. Woodruff that he could not get a fair trial in Chester County. Woodruff reported this to Tomlin who gave him incorrect advice. Tomlin could have dismissed the plaintiffs' cases in the state court without prejudice and refiled in the federal court.
 
 
 145
 An incident took place in the second trial in the state court which reveals the wisdom of the advice given by the juror to Mr. Woodruff, namely, a claim of tampering in the second state court trial with a juror by the defendant Nobles who offered to permit the juror to use his (Nobles) farm for coon hunting.
 
 Conclusion
 
 146
 The two girls have been subjected to two trials of their lawsuits in the state circuit courts and one appeal to the state court of appeals. In the federal court their malpractice suit was erroneously dismissed by the district judge on the ground it was barred by the state statute of limitations. We reversed and remanded for trial. Woodruff v. Tomlin, 511 F.2d 1019 (6th Cir. 1975). On remand the district judge erroneously held that conflict of interest claim against Tomlin could not be joined with other grounds of malpractice such as negligence. Woodruff petitioned this court for a writ of mandamus which we dismissed on the ground that no appeal could be taken from the pretrial order as it was an interlocutory order; that mandamus was an extraordinary remedy and could not be used as a substitute for appeal. Woodruff v. Honorable Bailey Brown, No. 76-1892, Sixth Circuit Court of Appeals.
 
 
 147
 As before pointed out, the plaintiffs in the district court were denied the use of a wealth of relevant and competent evidence tending to prove conflicts of interest and negligence of Tomlin. Even without such evidence, the jury disagreed and the district judge then granted judgment n. o. v. in favor of Tomlin erroneously as is held in the majority opinion. If the erroneously excluded evidence had been admitted, an entirely different result could have been obtained.
 
 
 148
 It is a travesty that these young girls horribly injured in 1968 by reason of the negligence of truckers impeding traffic on the public highways have not obtained justice. Their failure to obtain justice, as has been pointed out, is due to the improper handling of their cases by their lawyers and a jury should now be permitted to decide the issues of fact with all the evidence admitted which was previously erroneously excluded.
 
 
 149
 ENGEL, Circuit Judge, dissenting.
 
 
 150
 Because I believe that the majority has departed from the admonitions of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to substitute its judgment for what is plainly the law of Tennessee, I must respectfully join Judge Merritt in his dissent.
 
 
 151
 In my opinion, the trial judge correctly held that Stricklan v. Koella, 546 S.W.2d 810 (Tenn.Ct.App.1976), compelled the directed verdict. Clearly, the Tennessee Court of Appeals, in deciding Koella, directly relied upon the rationale of Rondel v. Worsley, (1966) 1 All E.R. 467, (1966 C.A.) 3 All E.R. 657 and (1967 H.L.) 3 All E.R. 993, which expressly held that clients had no action against a lawyer for negligence in the conduct of the case in court. If the Tennessee courts choose to repair to English law for guidance, our court should not interfere. They have a right to seek wisdom where they can find it. One of the glories of our federal system is its ability to tolerate a wide variety of legal experience, even at the expense of foregoing the advantage of uniformity throughout the several states.
 
 
 152
 The majority opinion, in a scholarly and highly intelligent way, seeks to reconcile Koella with the general law of malpractice observed in Tennessee and elsewhere throughout the United States. In my opinion, however, the end result simply is to rob Koella of all of its substantive meaning as a rule of law governing the liability of attorneys with respect to their conduct of their client's case in the state's courts. Right or wrong, the intention of Koella, as indeed of Rondel, was to remove altogether from the jury's consideration evaluations of the conduct of attorneys based solely upon negligence. For all practical purposes, the majority opinion reduces the issue decided in Koella to a question of semantics. I do not think this is the intent of the Tennessee courts.
 
 
 153
 While I generally subscribe to the views expressed by Judge Merritt in his dissent, I have one reservation. I am not at all certain that the limited immunity conferred by Koella extends to that conduct of an attorney which is basically investigative in nature. Nearly every activity which an attorney undertakes and which is subject to the usual laws of legal malpractice in Tennessee and elsewhere will involve investigation both of the law and of the facts. It may also pose the potential for ending up in litigation if a resolution of difference is not amicably reached. I am reluctant to hold, therefore, that this investigative activity is within the limited immunity of Koella in the absence of some definitive statement to that effect from the Tennessee courts. In my view, we need not reach this legal issue because even under the majority's more liberal view, the testimony which might have been elicited from neglected witnesses is not sufficiently different from that already on the record to warrant a reversal and remand for a new trial on that account. There may indeed have been a factual dispute between the testimony of these witnesses and of the police officer, but in my opinion that dispute was not material and would not have affected the outcome of the case.
 
 
 154
 That the Tennessee Bar Association has filed an amicus brief strongly supporting the district court opinion can perhaps be charged to the special interest of the state's legal community in avoiding an expansion of its professional liability. I cannot, however, so easily dismiss the fact that both active judges on our court from Tennessee, one of whom tried the case, are of like mind. We have repeatedly accorded considerable weight to the interpretation of state law made by the federal judges who are located in that state and who, therefore, are possessed of a greater sensitivity to the state's interpretation of its own laws. Lenoir v. Porters Creek Watershed District, 586 F.2d 1081, 1093 (6th Cir. 1978). See also Martin v. University of Louisville, 541 F.2d 1171, 1176 n.7 (6th Cir. 1976), and cases cited therein. The Supreme Court has stated that:
 
 
 155
 In dealing with issues of state law that enter into judgments of federal courts, we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown to be unreasonable.
 
 
 156
 Propper v. Clark, 337 U.S. 472, 486-87, 69 S.Ct. 1333, 1342, 93 L.Ed. 1480 (1949), cited with approval by Mr. Justice Stevens in Bishop v. Wood, 426 U.S. 341, 346 n.10, 96 S.Ct. 2074, 2078 n.10, 48 L.Ed.2d 684 (1976).
 
 
 157
 MERRITT, Circuit Judge, dissenting.
 
 
 158
 I find the opinion of the Court unsatisfactory for two reasons. First, the Court erroneously concludes that the standard of liability for a lawyer engaged in litigation in Tennessee courts is one of ordinary negligence. This conclusion directly conflicts with the law as declared by Tennessee courts. Second, even if ordinary negligence were the standard under Tennessee law, the Court's application of that standard to the facts of this case is unacceptable.
 
 I.
 
 159
 Stricklan v. Koella, 546 S.W.2d 810 (Tenn.Ct. of Appeals, 1976), is the only reported Tennessee case which decides, or even discusses, the liability of a lawyer in the conduct of litigation. There the complaint alleged that the lawyer, in advance of trial, did not take three depositions as instructed by his client. The complaint did not allege bad faith but rather stated that the lawyer's preparation for trial was negligent, "unprofessional" and "unskilled."
 
 
 160
 After quoting from the portion of the complaint which asserts a negligence theory, the Tennessee Court of Appeals said: "(w)e hold that there can be no such cause of action in this state." Id. at 812. The Tennessee Court then acknowledged that "ordinarily a lawyer, like a physician, is liable for professional negligence," but stated that entirely different considerations apply to "a cause of action for alleged negligence in the attorney's choice of trial tactics or conduct of the cause." Id. at 812-13. As explained by the Tennessee Court, these considerations are as follows: (1) in litigation a lawyer has a different responsibility than in other legal matters, "a duty to the court which is paramount"; (2) the special nature of trial practice creates pressures, delays, strategems and lapses which the layman or "the client does not know" and understand and may "(t)o him . . . indicate incompetence or negligence"; (3) "the possibility of being sued for negligence would at least subconsciously lead some counsel to undue prolixity (or defensive rather than vigorous and creative advocacy), which would not only be harmful to the client but against the public interest"; (4) a lawyer should not be held responsible for negligent errors and omissions in a case decided by a jury because "only by pure guesswork can the verdict of a jury be examined and a so-called cause for that verdict be determined." Id. at 813. The Court then concluded "that for the reasons given, there can be no cause of action (for negligence) against an attorney arising out of the manner in which he honestly chooses to present his client's case to the trier of the facts." Id. at 814.
 
 
 161
 One may or may not agree with the policies enunciated by the Tennessee Court, but it has declared the current applicable standard of liability in Tennessee. It is not a negligence standard but a standard based on the "honesty" or "good faith" of the lawyer in the presentation of the case.
 
 
 162
 It is important to emphasize that under this standard the trial lawyer is not absolutely immune from civil liability for wrongful conduct, as are judges and prosecutors under federal law. Tennessee law gives the trial lawyer only a qualified privilege or immunity. Like the standard applicable to certain officials under federal law, see Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Tennessee trial lawyer is civilly liable only for wrongful conduct that amounts to bad faith.
 
 
 163
 It is not unusual that this should be the standard. Under New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), journalists who exercise public responsibilities under the First Amendment are liable only for "malice" or the "reckless disregard" of the rights of others, not for negligent investigation, misstatement, omission or conflict of interest. They are given a qualified privilege, based on honesty and good faith, because of the nature of their work. There are other fields of law in which courts have devised ways to limit the liability of a person employed to exercise his trained judgment. For example, the public official and the corporate director are not liable for negligent mistakes in the exercise of discretion in making decisions. They are given a qualified privilege based on good faith. See Wade, A Survey of the Law of Legal Malpractice, 32nd Ann.Proc.Miss.L.Inst. 49 (1978).
 
 
 164
 Trial lawyers have functions to perform similar to those of the journalist. When representing clients in court, they perform important duties referred to in the Constitution. The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense," and the Seventh says that "In suits at common law . . . the right of trial by jury shall be preserved." Like journalists who cover public affairs, trial lawyers perform these functions in a heated, disputatious and highly competitive environment under strict deadlines and severe pressures. The search for truth is difficult and controversial. The trial lawyer's role is often misunderstood. When he presses his advantage too far, fails to press it far enough, or presses it just the right amount, someone may be injured and want to sue him for wrongful conduct. When he wins or when he loses, when the verdict is too small or too large, the lawyer is open to criticism and suit. A disgruntled party may believe that his lawyer or his lawyer's adversary unfairly caused the harm. The Tennessee Court cites these and other strong policy reasons for limiting the liability of lawyers engaged in litigation. My brothers simply pay no attention to the Tennessee Court's holding or to its reasons.
 
 
 165
 In addition, the Court gives no consideration at all to the Tennessee Court's discussion of proximate causation and fails entirely to analyze this issue. Should the members of the original jury and the trial judge have been called and asked to speculate upon the outcome of the case if the lawyer had followed the different strategy now advocated by the Woodruff family? The Court makes no effort to discuss this problem at all or give any guidance to the District Court in the trial of the case upon remand.
 
 
 166
 The Tennessee Court said: "Putting it as simply as we can, there is no way on God's green earth that any one man, any twelve men, or any twelve hundred men, can tell with one iota of certainty how another man or jury would have decided a case if such and such had been said or done or had not been said or done. . . . " There was no reliable proof on the subject of proximate cause in the court below. The Woodruff family did not attempt to prove a casual relationship between the lawyer's conduct and the plaintiff's damage. They should not be able to recover unless they prove that the jury would have reached a different verdict had the lawyer conducted the case differently. We should not remand the case for a new trial when the element of causation is entirely absent.
 
 II.
 
 167
 Even if ordinary negligence were the standard of liability, a fair analysis of the facts shows that the lawyer was not guilty of negligence in marshalling and presenting the case to the trier of fact.
 
 
 168
 Except for the severity of the injuries to the Woodruff sisters, this was not an unusual automobile accident case. Similar accidents have occurred and similar cases have been tried many times.
 
 
 169
 The Woodruff sisters' automobile was traveling west in a rural area of West Tennessee on a two lane, paved road, divided by a center line. Coming from the opposite direction in the eastbound lane was the heavily loaded tractor-trailer truck of James Pomeroy. The sisters topped a hill and saw the automobile of Lewis Nobles approximately 300 feet in front of them traveling in the same direction in the same lane. The Nobles automobile was stopped or traveling very slowly in preparation for a left turn across the road.
 
 
 170
 As demonstrated by the testimony of Joan Woodruff on page 61 of the transcript of the original trial, Patsy Woodruff panicked, slammed on the brakes and lost control of her car. Her car skidded some 250 feet into and across the wrong lane of traffic so that the front of her car headed south and the back end protruded onto the highway blocking a portion of the eastbound lane of the road. Nobles had seen the Woodruff car in his rear view mirror as it topped the hill and decided to abort his turn and drive forward in order to clear the road for the oncoming car.
 
 
 171
 Pomeroy, the driver of the truck, was also faced with a quick decision. The Nobles car was in the opposite lane, and the Woodruff car was skidding towards him in his lane of traffic. Pomeroy pulled his truck off the road onto the right shoulder and applied his brakes. The Woodruff car, however, came all the way across the road and blocked the shoulder of the road on Pomeroy's right; the back end protruded onto the road in Pomeroy's lane of traffic. When Pomeroy saw he could not avoid the Woodruff car by pulling off the road to the right, he cut back to the left. The front end of Pomeroy's truck crashed into the rear right side of the Woodruff car. Immediately after the crash Pomeroy faced yet another car coming in the westbound lane driven by Gayle Sterling. In order to avoid a head-on collision he cut back to the right missing her car completely.
 
 
 172
 The officer who investigated the accident testified that the Woodruff car laid down 252 feet of skid marks. This evidence, together with the driver's loss of control, indicates that the Woodruff car was traveling at a high rate of speed. Other testimony showed that the Woodruff girls were in a hurry to get home and had just passed another car going approximately 50-55 miles an hour. (Or.Tr. pp. 9, 36, 68.)
 
 
 173
 Based on these facts, the jury reached a logical conclusion. They concluded that the accident was caused by the negligent failure of the driver of the Woodruff car to keep her car under control. Were we reviewing the jury verdict on direct appeal, we would find no difficulty in sustaining the verdict below.
 
 
 174
 The majority opinion of our Court suggests that the result would have been different had the lawyer relied on T.C.A. §§ 59-854 and 59-859. Apparently, the Court overlooked the fact that the lawyer did rely on § 59-859. The statute is clearly set out in the original complaint page 8, but the transcript of the trial at page 521 shows that the trial judge refused to include it in his charge to the jury.
 
 
 175
 Neither § 854 nor § 859 is applicable to the facts of this case. Section 854(a) provides:
 
 
 176
 No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or in compliance with law.
 
 
 177
 Nobles was entitled to slow his car down at the bottom of the hill in order to turn left. Section 854 does not apply to prohibit a driver from slowing or stopping his car in the face of oncoming traffic in order to make a turn. The record shows that Nobles intended to turn left onto Murdock Road. On pages 340-41 and 451 of the trial transcript, Pomeroy and Nobles testified that Nobles' left turn signal was blinking. The Court's argument that the statute may be used to establish negligence per se on the part of Nobles simply will not stand analysis. Such an instruction by the state trial court would have been error.
 
 Likewise, § 859 is inapplicable:
 
 178
 Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway . . . and a clear view of such stopped vehicles shall be available from a distance of two hundred (200) feet in each direction upon such highway.
 
 
 179
 The facts demonstrate that Nobles had not parked his car on the highway but was slowing down to turn left. In addition, there is no proof that "a clear view" of Nobles' car was not "available from a distance of two hundred (200) feet." There was testimony throughout the record that it was between 300 and 330 feet from the crest of the hill to where Nobles' car was stopping to turn left. (Trans. of original trial p. 368.) In fact, the Woodruff's own expert witness in the malpractice trial testified that the distance was some 300 feet from the crest of the hill to Murdock Road (Trans. of malpractice trial pp. 524-25.)
 
 
 180
 These two statutes are, therefore, inapplicable to the situation at hand, and under no reasonable interpretation can the lawyer for the Woodruff family be said to be derelict in failing to insist that Nobles violated these two statutes.
 
 
 181
 The Court is also in error when it concludes that Tomlin's failure to interview three witnesses, Burkhead, Mclendon and Eddie Woodruff, should have gone to the jury on the issue of negligence.
 
 
 182
 The transcript of the malpractice trial at pages 741-42 shows that an investigator did interview Burkhead and furnished his statement to Tomlin. Although Burkhead did not see the accident, he said in the statement that based on noises he heard coming from the scene of the accident, he believed that the Nobles car moved forward before the accident occurred. Tomlin concluded on the basis of the statement that Burkhead's testimony would not be helpful. It conflicted with plaintiffs' theory that Nobles' automobile remained stationary in front of the Woodruff automobile, thereby creating a hazard. The lawyer concluded that interviewing Burkhead would serve no purpose. This appears to be the kind of tactical decision or exercise of judgment that should not go to the jury even under the standard advocated in the majority opinion.
 
 
 183
 Tomlin testified that he did not interview the two other witnesses, Mclendon and Eddie Woodruff, because he did not know of their existence. The father and mother of the girls testified that they told Tomlin during the first trial that these two witnesses could give helpful testimony rebutting the testimony of Lieutenant Melton, a Tennessee Highway Patrolman of many years experience. Officer Melton had investigated the scene of the accident immediately after it occurred. He testified that he measured the length of the skid marks behind the Woodruff car. They measured 252 feet. Mr. and Mrs. Woodruff testified that they told Tomlin that the two witnesses would testify that they had gone to the scene of the accident and measured the skid marks to be considerably less than the distance stated by Officer Melton. Tomlin simply denied that anyone had told him that these two witnesses could so testify.
 
 
 184
 This conflict does present a credibility issue, but there is no proof or reason to believe that the jury would have disbelieved the testimony of Officer Melton or that Tomlin's failure to interview and call these two witnesses changed the outcome of the trial. The element of causation is missing. The witnesses were closely identified with the Woodruff family and had an interest in the outcome. Officer Melton was a neutral witness who testified that he measured precisely the length of the skid marks. It is pure speculation to say that the jury would have discredited his testimony. In order to send the case to the jury, there must at least be some reliable evidence on which the second jury could find a probability that the first jury would have reached a different verdict had the lawyer interviewed and called the witnesses.
 
 
 185
 On the so-called "conflict of interest" issue, there is a short answer. Had Joan, the passenger, decided to sue her sister, Patsy, the driver, she would have recovered nothing. The family's automobile liability insurance policy apparently contained an exclusion disallowing recovery by family members. Even if Joan had obtained a verdict against Patsy, there would have been no insurance funds to pay the judgment. How can the lawyer be liable for failing to advise Joan Woodruff to sue her sister when such a suit would have profited her nothing?
 
 
 186
 Moreover, the majority opinion is remarkably silent on the subject of Joan's consistent claim that her sister was not at fault. (See pages 8 and 38 of transcript of original trial.) Should another lawyer have been called in to try to persuade Joan to change her story to make out a claim against Patsy? Before my brothers condemn the lawyer, they should at least consider the ethical implications of such a course of conduct.
 
 
 187
 Lastly, and most important, the girls' legal guardian, the father, as a moral man, would not have consented for these injured girls to sue and testify against one another and thereby run the risk of lasting damage to the emotional stability of his children and the harmony of his family. As admitted by the Court, the record shows that Mrs. Woodruff did not want Patricia to feel that she was responsible for Joan's injuries (Deposition of Lila Woodruff, p. 11). Charles Woodruff stated that he never thought Patricia caused the injury to Joan (Deposition of Charles Woodruff, p. 25) and both testified that they were a close family (Trans. of original trial, pp. 157, 259). There was testimony by Charles Woodruff, Lila Woodruff and Louis Hamilton, Patricia's husband, that, after the accident, Patricia had a drastic personality change. She became depressed, defensive and had a short breaking point (Id. at 158, 260). She asked her father if she was at fault and had caused the accident (Id. at 156). Patricia also began doing poorly in school. She eventually had to drop out because of her inability to concentrate. If Joan had, in fact, brought suit against her sister Patricia, what would that have done to Patricia's state of mind?
 
 
 188
 Thus, there was no real conflict of interest between Joan and Patsy Woodruff. The issue is purely imaginary. Joan did not want to sue Patsy. She would have recovered nothing if she had. It would have been a stupid thing to do.
 
 
 189
 In closing, it should also be pointed out that the whole Woodruff family testified that they felt Hewitt Tomlin had done a commendable job and, in fact, thanked him for a "job well done." (See depositions of Lila, p. 13, Charles, p. 53, Joan, p. 55, and Patricia Woodruff, p. 9, respectively.) It was not until Charles Woodruff talked to the Arizona lawyer, Norman Herring, that he concluded Tomlin had not done a satisfactory job (Dep. pp. 54 & 60.) For our Court to permit this lawyer to continue to be harassed in this way is unjust.
 
 
 190
 For these reasons, I would affirm the judgment of the District Court directing a verdict for the defendant.
 
 
 
 [1]
 Though the court in Stricklan relied on the decision in the English case of Rondel v. Worsley, reported as (1966) 1 All E.R. 467; (1966 C.A.) 3 All E.R. 657; (1967 H.L.) 3 All E.R. 993; (1969) 1 A.C. 191, neither counsel nor we have found an American decision holding an attorney liable for the choice of trial tactics or the good faith exercise of professional judgment. On appeal the appellees also cited New Zealand cases which have followed Rondel v. Worsley, holding that attorneys are immune to suits for "work done in court." E. g., Bigger v. McLeod, 1 NZLR 321, 325 (1976)